## CHARLESTON.

Eureka Pipe Line Company *v.* Walter S. Hallanan *et al.*

United Fuel Gas Company *v.* Walter S. Hallanan *et al.*

Submitted November 9, 1920.    Decided November 26, 1920.

1.  Constitutional Law—*A  Permissible  Construction,  Making Statute Valid Rather Than Invalid, Will be Adopted.*

    There is a presumption that the legislature in the passage of an act did not intend to violate the constitution of this state, or of the United States, and if such an act is susceptible of two constructions, one of which would make the same invalid as in violation of the constitution of this state, or of the United States, and the other give validity to the act, the latter interpretation will be adopted upon the theory of legislative intent not to violate any provision of either of said instruments.  (p. 404).

2.  Same—*Presumption  That Legislature Intended Act to be Effective Will be Adopted.*

    There is a presumption that the legislature in the passage

of an act intended that it should be effective, and if such an act is susceptible of two constructions, one of which would render the act invalid as being in violation of the constitution of this state, or of the United States, and the other sustain the validity of the act, the latter will be adopted upon the presumption that the legislature intended that construction to be given to the act that would make it effective.  (p. 404).

3.  COMMERCE—*State Cannot Impose Tax on Interstate Commerce.*

A state may not impose a tax upon the privilege of engageing in interstate commerce within its borders.  (p. 404).

4.  SAME—*State Tax on Interstate Commerce, Measured by Per Centage of Business Within State, Cannot be Imposed.*

A state may not impose a tax upon the privilege of engaging in intrastate commerce, and measure the amount thereof by a certain percentage of all of the business transacted within the state, whether interstate or intrastate.  (p. 404).

5.  SAME—*Tax Upon Transportation of Oil and Gas by Pipe Lines Relates only to Intrastate Commerce.*

Chapter 5 of the Acts of the Legislature, Extraordinary Session, 1919, imposing a tax upon the business of engaging in the transportation of oil and gas by pipe lines, properly construed, imposes such tax on those engaged in the transportation of such commodities in intrastate commerce, measured by the amount of such commerce.  (p. 408).

6.  CONSTITUTIONAL LAW—*For Taxation of Pipe Lines Held Not to Deny Equal Protection of the Laws.*

The classification, for the purpose of taxation, of pipe line companies engaged in the business of transporting oil and gas into those whose systems are under ten miles in length, and those whose systems are over ten miles in length, is founded upon a substantial distinction, and is not violative of that clause of the fourteenth amendment to the Constitution of the United States guaranteeing to all persons the equal protection of the laws, nor of section 1 of article 10 of the Constitution of this state, the tax imposed applying alike to all in the same class.  (p. 408).

7.  STATUTE—*Statutes Taxing Transportation of Oil and Gas by Pipe Lines Held Not Invalid Because Not Specifying Pressure at Which Gas Should be Measured.*

Chapter 5 of the Acts of the Extraordinary Session of the Legislature, 1919, imposing a tax upon the privilege of engaging in the business of transporting oil or gas by pipe lines

is not invalid because it does not specify at what pressure
the gas shall be measured for the purpose of the imposition of
such tax.    Any difficulty in administering the law on this
account may be overcome by a regulation which the State
Tax Commissioner is authorized by the provisions of the act
to make.    (p. 413).

8.    LICENSES—*Tax on Privilege of Transporting Oil and Gas by
Pipe Lines Over a Certain Length of System Held Valid.*

Chapter five of the Acts of the Legislature, Extraordinary
Session, 1919, imposing a tax upon the privilege of engaging
in the business of transporting oil or gas by pipe lines over
ten miles in length, properly construed does not violate any
provision of the Constitution of the United States or the Con-
stitution of this state, and is a valid and binding legislative
act.    (p. 414).

9.    COMMERCE—*Commodities in Transit Not "Interstate Com-
merce" Until it is Found that They Are Destined to Points
Beyond State.*

Commodities in transit cannot be said to be interstate com-
merce until it is definitely determined that they are destined
to points without the state, even though past experience and
the course of business in which the owner of such commodity
is engaged may justify the assumption that a large part thereof
will ultimately be transported beyond the borders of the
state.    (p. 414).

10.    SAME—*Transportation of Oil Through State to Point Beyond
is "Interstate Commerce" Though Contaminated by Con-
tact With Other Oil in Pipe Line.*

Oil being transported through this state to a point beyond
its borders does not cease to be interstate commerce because it
may as an incident of its transportation through the pipe line
come in contact with other oil, and to some extent thereby be
contaminated.    Such contamination is merely an incident of
the transportation, and does not change the character of the
oil as interstate commerce.    (p. 414).

11.    SAME—*Pipe Line Company, Receiving Oil and Transporting it
in the State for a Charge, is Engaged in "Intrastate Com-
merce."*

A pipe line company doing business in this state which
receives the oil produced at numerous wells and transports
the same to its main pipe lines or tanks within the state, and
makes a definite charge for such service, is engaged in intra-
state commerce, as to the oil so transported, where it appears
that at the time such oil was so received and transported to

its main lines or tanks by it it was not definitely determined that the same was destined to points without the state, even though past experience may indicate and justify the belief that a large part of the same will ultimately be shipped without the state in interstate commerce.   (p. 420).

(WILLIAMS, PRESIDENT, and LYNCH, JUDGE. absent.)

Appeal from Circuit Court, Kanawha County.

Suits for injunction by the Eureka Pipe Line Company and by the United Fuel Gas Company against Walter S. Hallanan, State Tax Commissioner, and others.   Decrees for plaintiffs, and defendants appeal.

*Reversed in part.   Affirmed in part.*

*E. T. England,* Attorney General, *Frank Lively,* assistant Attorney General, *John T. Simms, S. B. Avis, Wm. Gordon Mathews* and *Fred O. Blue,* for appellants.

*Frank L. Crawford, A. B. Fleming, Charles Powell, Kemble While* and *H. C. Dorworth,* for appellee Eureka Pipe Line Co.

*R. G. Altizer* and *Malcolm Jackson,* for appellee United Fuel Gas Co.

RITZ, JUDGE:

These appeals bring up for review decrees of the Circuit Court of Kanawha county entered in the above entitled causes holding invalid an act of the Legislature providing for a tax on the transportation of oil and gas by means of pipe lines, and enjoining the defendants from collecting the tax levied by said act.

The act in question is chapter five of the Acts of the Extraordinary session of the Legislature of 1919, the pertinent provisions thereof being:

"AN ACT to levy a privilege tax on any person, firm or corporation engaged in the transportation of crude oil or petroleum, or the distillates thereof, or of natural gas, by means of pipe lines, authorizing the state tax commissioner to provide rules and regulations for the collection of such tax, and defining the duties of the state tax commissioner hereunder.

*Be it enacted by the Legislature of West Virginia:*

Section 1.   No person, firm or corporation, hereinafter called company, after the first day of July, one thousand nine hundred and nineteen, shall engage in or continue in the business of the transportation of crude oil or petroleum, or the distillates thereof, or of natural gas, by means of pipe lines, without the payment of an annual privilege tax hereby imposed for engaging in such business; *provided, however,* that nothing contained in this act shall apply to any person, firm or corporation engaged in the business aforesaid where the crude oil, petroleum or distillates thereof, or natural gas, is by the entire system of such person, firm or corporation, transported a distance of less than ten miles.

Sec. 2.   Every person, firm and corporation engaged in this state in the transportation of either crude oil or petroleum, or the products and distillates thereof, or of natural gas, or both, by means of pipe lines for sale to consumers within or without the state, or use within or without the state in the making of any products derived therefrom, shall pay to the state, as an annual privilege tax for engaging in such business in the state, two cents for each barrel of crude oil or petroleum, or the distillates thereof, and one-third of one cent for each thousand cubic feet of such natural gas as is so transported or conveyed within this state.   *Provided,* that only one such tax, annually, shall be required to be so paid.

Sec. 9.   Any company engaging or continuing in the business aforesaid, without having first secured a license, as hereinbefore provided, shall be liable to a fine of not less than one thousand dollars nor more than ten thousand dollars."

The contention of the complainants is that this act is in violation of the commerce clause of the Constitution of the United States, for the reason that the tax therein provided to be collected is a burden upon such commerce.   Further that it violates the provision of the fourteenth amendment to the United States Constitution guaranteeing the equal protection of the laws, as well as section 1 of article 10 of the Constitution of this state, providing, among other things that the legislature may levy a tax on privileges and franchises by equal and uni-

form laws.  And the gas company also claims that it is invalid
upon the additional ground that it does not prescribe a certain
measure for the tax inasmuch as it transports gas under varying
pressures, the bulk of which varies because of the differing pres-
sures under which it is transported, and this act not prescrib-
ing any particular pressure at which the gas should be measured,
there is no certain measure for the tax, wherefore it is void for
uncertainty.

The complainant, Eureka Pipe Line Company, is engaged in
the business of transporting oil by means of pipe lines. It does
not engage in the business of buying and selling or producing
this substance, but simply transports it from one point to
another for its patrons, upon tariffs prescribing regular charges
for such service. It has a pipe line extending from a point on
Tug River in Wayne county, through the state, to a point on the
Pennsylvania state line.  At its southern terminus on Tug River
it connects with the Cumberland Pipe Line Company's system,
and at its northern terminus on the Pennsylvania state line it
connects with the pipe line systems of the Southern Pipe Line
Company and the Southwestern Pipe Line Company.  It also
has a connection at Eureka on the Ohio river with the Buck-
eye Pipe Line Company, this connection being made by a branch
extending from Braden, a point on the line between Tug River
and Morgantown, to the Ohio River at Eureka.  In addition to
these trunk lines the Eureka Company owns many miles of
branch or gathering lines extending from the main pipe lines to
the fields where the oil is produced, and through which gathering
lines it is collected and conducted from the producing wells to
the trunk lines, through which it is shipped to market.  In ad-
dition to handling large quantities of oil produced in West
Virginia in this way, it receives at the Tug River terminus a
large quantity of oil from the Cumberland Pipe Line Company,
which is transported across the state of West Virginia and
delivered to the Southern Pipe Line Company at the Pennsyl-
vania state line for delivery through that company and its con-
necting carriers to the consignees at the seaboard.  This oil is
practically all produced in the state of Kentucky, there being a
small quantity produced in the county of Cabell in the State of

West Virginia. This production in Cabell county is, however, gathered by another company, and all of it thus received by the Eureka Company is delivered to it by the Cumberland Company at the Tug River terminus. This oil is known as Somerset-Cabell oil, and is different in grade and quality from the oil produced in West Virginia. The Eureka Company also receives at its Eureka connection with the Buckeye Pipe Line Company considerable quantities of oil for transportation from that point and delivery to the Southern Pipe Line Company at the Pennsylvania state line for transshipment to the seaboard. The oil received by it at Eureka is made up of two different grades, one known as Corning Oil, which is produced in the state of Ohio, and the other—a smaller quantity —of Pennsylvania grade oil. The Pennsylvania grade oil is the same in quality and grade as the oil produced in West Virginia. The Corning oil, however, is of a lower grade. The complainant pipe line company also receives from the Southwest Pipe Line Company at the Pennsylvania state line large quantities of what is known as mid-continent oil for transportation from that point through its lines to another point on the Pennsylvania state line, for delivery to the Southern Pipe Line Company, for transshipment to the seaboard. This oil is also of a different quality and grade from that produced in West Virginia, and is produced in the states of Texas, Oklahoma, and other mid-continent territory. Of the oil produced in West Virginia and transported by the complainant pipe line company, a considerable quantity is delivered to refineries at Parkersburg and St. Marys. The remainder is ultimately delivered by the complainant pipe line company through its lines to the Southern Pipe Line Company at the Pennsylvania state line for transshipment to the refineries at the seaboard. Without going further into the details of the complainant Eureka Pipe Line Company's business at this time, it is apparent that it is engaged in intrastate commerce to a considerable extent, at least to the extent of the oil delivered by it to the refineries at Parkersburg and St. Marys, and it may be said that it is likewise engaged to a very considerable extent in interstate commerce, as to the volume of which, however, counsel for the respective parties do not agree.

The complainant United Fuel Gas Company is engaged, not only in the business of transporting natural gas within the state by means of pipe lines, but also of producing such gas and buying it from other producers, and selling it to its customers. Its production and purchase of gas is very substantial. A large quantity of gas thus produced and purchased is by it conveyed to numerous cities and towns in the southern part of the state of West Virginia, and sold to the inhabitants thereof. Still another portion is conveyed to the states of Kentucky and Ohio and sold by the complainant to its customers in those states. Another larger portion of it is conveyed to a point on the Ohio River near Ravenswood, where it is sold and delivered to the Ohio Fuel Supply Company, by which company it is conveyed into the state of Ohio and there sold and delivered to the customers of that company. Another considerable quantity of gas is by it delivered from one of its lines at Ball's Gap in Cabell county, West Virginia, to the Columbia Gas and Electric Company, which is by that company sold partly within the State of West Virginia, and partly conveyed by it without the state, and sold to its customers in Ohio and Kentucky. It also delivers to the Hope Natural Gas Company and to the Pittsburg and West Virginia Gas Company, at a point in Gilmer county, large quantities of gas, that sold and delivered to the Hope Natural Gas Company being resold by it within the state to the extent of thirty-three per cent. thereof, and the residue, sixty-seven per cent., without the state; and of that delivered to the Pittsburg and West Virginia Gas Company, twelve per cent. thereof is sold within the state, and the residue thereof without the state. It will thus be seen that this company is likewise engaged to a very considerable extent in both intrastate and interstate commerce; in fact, counsel concede this to be true, although they do not agree as to the extent of each class of such commerce.

The contention of the complainants is that the act under which it is proposed to collect the taxes sought to be enjoined in this case is an attempt upon the part of the State of West Virginia to charge a tax for the privilege of engaging in interstate commerce, while the defendants contend that the act properly

construed does not lay any tax upon the privilege of engaging in interstate commerce, but is only intended to, and, upon a proper construction, does only impose such tax upon the transportation of oil and gas in intrastate commerce within the confines of the State of West Virginia, but contend that the amount of this tax is measured by the total amount of commerce carried on by the complainants of both classes within or through said state. The complainants insist that even though the act be construed as imposing a tax for the privilege of doing intrastate commerce, the amount thereof to be measured by all of its business, both in intrastate and interstate commerce, it is invalid, inasmuch as it would impose a burden upon the interstate commerce carried on by it, as well as upon the intrastate commerce.

If the contention of the complainants that this act is an attempt to impose a tax upon the privilege of carrying on interstate commerce within the State of West Virginia is correct, then undoubtedly it is invalid as being in violation of the commerce clause of the Constitution of the United States. If the act is to be construed as forbidding the complainants from engaging in their interstate business, unless they procure the license therein provided for, it cannot be sustained, and this construction, the complainants insist, is the only one consistent with the terms of the act. That a state cannot levy any tax upon interstate commerce, or charge any license for the privilege of engaging in such commerce within the state, is the uniform doctrine of this Court, as well as the Supreme Court of the United States. *Pennywitt* v. *Blue,* 73 W. Va. 718; *Crutcher* v. *Kentucky,* 141 U. S. 47; *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489. The doctrine of these cases has been repeatedly asserted by the Supreme Court of the United States, and, indeed, is not questioned by counsel for the defendants here.

The question, therefore, which confronts us at the threshold is, what is the proper construction of this act in this regard? It will be observed that the act is couched in general terms broad enough to include the business of transporting natural gas and petroleum oil in any class of commerce anywhere. In fact, to give to the language used the most extended application

of which it is capable, it would include the transportation of these substances, not only in interstate and intrastate commerce within the State of West Virginia, but in both of such classes of commerce in any other state in the Union. Of course, the legislature did not use this language in this broad comprehensive sense. There are some rules of construction which must be kept in mind in determining the legislative intent. The presumption is that the legislature did not intend to violate either the Constitution of this state, or of the United States, and where language of a general nature is used which may be construed to embrace within its terms matters beyond the competence of the legislative authority, and also be given a narrower construction consistent with its terms which would confine it within the legislative power, the latter construction will be adopted in order that the legislative purpose may be accomplished, the presumption being, as before stated, that the legislature intended to use it in such narrow or limited sense rather than in the broad comprehensive sense which would make it include subjects beyond its power. Another rule which may be said to be a qualification of the one just stated is that there is a presumption that the legislative authority intended the act to have effect, and where it is susceptible of two meanings, one of which would make the act invalid, and the other valid, the latter will be adopted as the one intended by the legislature. These rules of construction are a part of the fundamental law of the land, and have been applied by the courts with practical unanimity. In fact, it may be said that they are practical rules of construction applicable to all classes of instruments, whether legislative acts, private contracts, wills or deeds, but their application to the construction of legislative acts is more pronounced, perhaps, than to matters of private contract, largely because of the fact that those engaged in making the laws are more or less familiar with the constitutional limitations upon their powers, and are presumed to have acted with full knowledge of such limitations, and to have intended not to go beyond them. In the case of *Underwood Typewriter Co.* v. *Piggott,* 60 W. Va. 532, this Court applied the above rules of construction and saved the legislative act in that case from invalidity by

restricting it in its application to matters within the legislative competence, although the language was broad enough to extend beyond this limit. We excerpt the following from the opinion of Judge POFFENBARGER in that case at page 536, which aptly expresses the views we have upon this question: "In seeking the true interpretation of the statute in question, rules of statutory construction must be observed, one of which is that a statute will never be so construed as to make it conflict with any constitutional provision, if the terms used by the legislature are susceptible of a meaning, and reconcilable to a view, that are consistent with the organic law. That a certain construction or interpretation of a statute will make its operation and effect violative of a constitutional right, or put it under the ban of a constitutional inhibition, is an admonition to the court that the construction is wrong, if the statute is susceptible of a construction that will make it valid. *Slack* v. *Jacob,* 8 W. Va. 612; *State* v. *Workman,* 35 W. Va. 267; *Bridge* v. *Kanawha Co.,* 41 W. Va. 658; *Robey* v. *Sheppard,* 42 W. Va. 286. This rule is founded upon two presumptions. One is that the legislature intended the statute to be operative and effective. This implies the other, that the legislature knows the limitations upon its power, imposed by the organic law." The same rules of construction were again applied by this Court in the case of *Coal & Coke Ry. Co.* v. *Conley et al.,* 67 W. Va. 129, and the language used in the act was limited in its application so as to bring it within the constitutional limitation imposed upon the lawmaking body. Again in the case of *Pennywitt* v. *Blue,* 73 W. Va. 718, we had under consideration an act imposing a license upon merchandise brokers. It made no distinction between those brokers engaged in interstate commerce and those engaged in intrastate commerce, but imposed a license tax upon those engaged in the business in general terms. In that case we held that the presumption above referred to would limit the act in its appilcation to those brokers engaged in intrastate commerce. holding that the general terms used in the act would be so far restrained as to avoid conflict between it and the federal Constitution, upon the presumption against intention to violate that instrument. This doctrine has been recognized by the United States Supreme Court in many cases, of which the following

are but a few:   *St. Louis Southwestern Ry. Co.* v. *Arkansas,* 235 U. S. 350; *Pullman Co.* v. *Adams,* 189 U. S. 420; *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366; *Singer Sewing Machine Co.* v. *Brickell,* 233 U. S. 304.

The complainants, however, contend that the language of the act in question cannot be so limited. They insist that the language used expresses a clear intent to lay this tax on all of the business done by pipe line companies in the transportation of oil and gas of whatever character, and this contention is based upon the language used in the second section of the act imposing a tax upon such products transported by pipe lines for sale to consumers within or without the state, or for use within or without the state. Without the aid of the attendant facts, this language would seem to indicate a purpose upon the part of the legislature to impose the tax upon all those transporting oil or gas within the state, regardless of its character, as interstate or intrastate commerce, but when we consider these terms and apply them to the conditions which are shown to exist, the sense in which the legislature used them may appear to be entirety consistent with an intention upon its part to apply the tax only to the intrastate business of the complainants. As an illustration, it is shown that a large part of the business of the complainant pipe line company consists of the transportation of oil from various wells within the State of West Virginia to the refineries located within the state, at which points it is converted into a product ready for use, and then transported without the state in interstate commerce. Again, it appears that a large part of the business of the pipe line company is the transportation of oil from the producing wells in the state to central points, where it is delivered into its trunk pipe lines and shipped to points, some of which are within, and some of which are without the state. For this gathering process, the pipe line company charges a regular and separate charge, and the business is carried on generally before the oil is destined to any particular point, but while it is simply being gathered up and collected in such quantities as that the owners thereof may find a ready market for it, and then after it is so sold it is transported by the pipe line company through its trunk lines to the point of destination, in most instances without the state of West Vir-

ginia.  A very similar condition affects a large part of the business of the gas company, as will be hereafter seen.  We must presume that the legislature was familiar with these conditions, and if the language used in the act can reasonably be made to apply to them we will so apply it rather than to give it a construction which would render the act nugatory.  This legislation was under consideration for a number of years before it was finally enacted, and the proposition that the state cannot impose a tax upon the business of engaging in interstate commerce is of such universal cognizance that we will not assume that the legislature intended to violate this constitutional limitation where any other reasonable interpretation can be given to the language, and particularly is this true where the subject matter of the act had been under consideration for a considerable length of time.  We, therefore, conclude that this tax, when the act is properly construed, is only upon the privilege of engaging in transporting oil or gas in intrastate commerce within the confines of the State of West Virginia, and that it does not extend to the privilege of engaging in interstate commerce within or without the state.  The complainants, if they desire to do so, under our view of this act, might carry on their interstate business, regardless of it, and so long as they did not engage in intrastate business, the penalties prescribed by the act would not apply to them.

Counsel for the respondents, while acceding to the views above expressed, so far as defining the subject of taxation, insist that in ascertaining the amount of the tax they are entitled to take as a basis therefor all of the business done by the complainants, whether in interstate or intrastate commerce.  Of course, it may be that particular language will be given different meanings or interpretations when used under different circumstances, or for the accomplishment of different purposes, but it is difficult for us to see why we should attribute to the language of this act a different meaning when applying it to the subject of the tax and the measure of the tax.  The language to be construed is the same, and the legislature was treating of the same general subject, and it cannot well be assumed that they meant the language to mean one thing when defining the subject to be taxed, and the same language to mean an entirely different

thing when defining the measure of the tax. Aside from this it may well be doubted whether the legislature has the power to adopt such a measure for the tax in this case. It will be noted that this tax is in addition to other taxation. It appears that the complainants have paid the taxes assessed against their property within the state; they have likewise paid a tax upon their corporate franchises levied by the state; and also an excise tax upon the profits arising from their business; and it is sought to collect this tax for the privilege of engaging in this particular kind of business in addition to the above taxes. If it can be said that the legislature has the power to tax the privilege of engaging in a particular kind of intrastate commerce in the state, and then measure that tax by the amount of interstate commerce done, as well as by the amount of intrastate commerce, it would accomplish by indirection what, by the uniform holdings, it could not accomplish directly. It could under the guise of taxing the privilege of doing intrastate commerce take a part of the interstate commerce. It seems to us that the reasoning which seeks to justify the adoption of the measure of the tax sought to be applied in this case is sophistical, and amounts to simply a confusion of terms, the result being exactly the same as if the tax had been laid upon the privilege of engaging in interstate commerce. The courts do not look at the form which may be adopted to accomplish a particular purpose, but where it appears that the necessary effect of the procedure contended for is to produce a result which necessarily imposes a burden beyond the power of the legislature, the form will be disregarded. We do not think the authorities relied upon by the respondents, that the total commerce carried on by the complainants may be used as the measure of the tax, sustain their view. They rely with a great deal of confidence upon the case of *Maine* v. *Grand Trunk Ry. Co.,* 142 U. S. 217. And it may be said that that case appears to be authority for their proposition. It is, however, in apparent conflict with the case of *Philadelphia & Southern Steamship Co.* v. *Pennsylvania,* 122 U. S. 326. In the latter case the court held that a tax imposed by the state of Pennsylvania upon the gross receipts of a steamship company, when such receipts were derived from commerce between the states and

foreign countries, was unconstitutional and void. In the former it was held that a tax imposed by the state of Maine upon a railway company for the privilege of doing business within the state, measured by its total receipts from business done within and without the state in proportion to its total mileage in the state, as compared wih the total mileage of the company, was valid. In the case of *Galveston &c. Ry. Co.* v. *Texas,* 210 U. S. 217, the court had under consideration a statute of the state of Texas imposing a tax upon the gross receipts of railroads, including receipts from intrastate as well as interstate business, and held the same invalid. In that case the doctrine laid down in the case of *Philadelphia & Southern Steamship Co.* v. *Pennsylvania,* above cited, was followed and that case distinguished from the Grand Trunk Ry. case. The distinction marked by the court between the two cases is that in the case of *Maine* v. *Grand Trunk Ry. Co.,* while the tax imposed was laid upon interstate as well as intrastate commerce, it was imposed in lieu of a property tax. The legislature undoubtedly had a right to impose a tax upon the property of the company located within the state, and the imposition of this tax by taking a part of its gross receipts would be sustained, unless it appeared that the same was grossly unfair or imposed an unjust and unreasonable burden upon the railroad company. Upon the same theory the tax upon a part of the gross receipts of an express company was justified in the case of *United States Express Co.* v. *Minnesota,* 223 U. S. 335. Recognizing these distinctions made by the court in those cases, they lose their force as pertinent authorities in this case for the very good reason that the tax sought to be imposed here is not one in lieu of a property tax, or is not a method adopted by the legislature for valuing the property for the purpose of taxation. This case is much like the case of *Oklahoma* v. *Wells, Fargo & Co.,* 223 U. S. 298. In that case it was sought to impose a tax on the gross revenue of the express company, not as a means of valuing its property for the purpose of property taxation, but in addition to all other taxes, as is the case here, and the court held that under those circumstances the tax could not be sustained. The doctrine of this case was followed in the case of *Looney* v. *Crane Company,* 245 U. S. 178, which involved the right of

the state of Texas to impose a privilege tax based upon the amount of commerce carried on, both intrastate and interstate; and also in the case of *Crew Levick Co. v. Pennsylvania*, 245 U. S. 292, in which latter case the case of *Ficklen* v. *Shelby County Taxing District*, 145 U. S. 1, which is much relied upon by the respondents, is commented upon and distinguished and made inapplicable to the case we have presented here. Reference to the cases we have cited will show that the Supreme Court of the United States has distinguished all of the cases relied upon by the respondents from such a case as is presented by this record, and justify the conclusion in those cases upon grounds which do not here exist. We are constrained to hold that if the interpretation placed upon this act by the respondents is the proper one it would be invalid, or would be no more than a direct tax levied upon the right to do business in interstate commerce. As before stated, however, we do not agree with this interpretation, and the fact that such an interpretation would render the act invalid is a very strong reason for giving it another interpretation if it can reasonably be done. Our conclusion is that the act, both as to the subject of the tax, and as to the measure of it, the language used for both purposes being the same, applies only to intrastate commerce carried on by the complainants.

The complainants insist that the act complained of is invalid for the reason that it denies to them the equal protection of the law guaranteed by the provisions of the fourteenth amendment to the Federal Constitution, because it does not require the privilege tax from those engaged in the business of transporting oil and gas through pipe lines under ten miles in length, or from those engaged in transporting it by means other than pipe lines, such as in tank cars by rail. The question presented by this contention is whether or not the classification made by the legislature for the purpose of the imposition of this tax is a justifiable one. It is uniformly held that notwithstanding, by the constitution of a state, taxes must be levied by equal and uniform laws, and that the equal protection of the laws is guaranteed by the fourteenth amendment of the Federal Constitution, a state in the exercise of its taxing power may classify the subjects of taxation within its limits, and so long as the

classifications thus made have a reasonable basis for their existence, and the tax imposed upon each member of each class is uniform, the same does not violate such constitutional limitations. *Pacific Express Co.* v. *Seibert,* 142 U. S. 339; *King* v. *Mullins,* 171 U. S. 404; *Citizens' Telephone Co.* v. *Fuller,* 229 U. S. 322; *Standard Oil Company* v. *Fredricksburg,* 105 Va. 82; *Sperry & Hutchinson* v. *Mellon,* 69 W. Va. 124. And as declared· by the Supreme Court of the United States in *Citizens' Telephone Co.* v. *Fuller, supra,* the power to classify for the purpose of taxation is broader than such power of classification when exercised for other legislative purposes. It appears in this case that the exemption of pipe lines under ten miles in length is based upon the consideration that such lines are used largely by comparatively small producers, and are owned by them, and are for the purpose of gathering the oil together and conveying it to a branch of a regular pipe line company, and that such short lines are not used. to any considerable extent in the regular business of transporting oil. It would seem that this would offer a reasonable basis for the classification thus made. In *Railway Co.* v. *Conley,* 67 W. Va. 129, an exemption of railroads under fifty miles in length, and of electric lines and street railways from the application of the two cent rate law was sustained, and this conclusion was approved by the Supreme Court of the United States in *Chesapeake & Ohio Ry. Co.* v. *Conley,* 230 U. S. 513. The ground for the classification of railroads into those over fifty miles in length, and those under fifty miles in length, it occurs to us has a less substantial basis than the classification made of pipe line carriers in this case. In the case of *King* v. *Mullins, supra,* the classification of lands into tracts containing less than one thousand acres, and those containing more than one thousand acres was sustained as a proper classification, and in *Pacific Express Company* v. *Seibert, supra,* a division for the purpose of taxation of those engaged in the express business into those owning their own cars and equipment, and those renting their cars and equipment. from railroads, was sustained as a legitimate one; and in *Citizens' Telephone Company* v. *Fuller, supra,* a classification of telephone lines for the purpose of taxation, making a distinction between the small lines of inconsiderable mile-

age, and the larger lines used in the general business, was sustained. These decisions and others which are cited in the opinions above referred to, we think, clearly sustain the power of the legislature to make the classification which it did make in this case, both as between those carriers engaged in the transportation of oil by pipe line and by rail or some other means, and those engaged in transporting it through lines over ten miles in length, and those engaged in the transportation through lines of less than ten miles in length. The contention made by the pipe line company that the act is confiscatory of its property is without merit. As we have construed the act, it does not appear that it will place any unreasonable burden upon the business in which this company is engaged, and if it should be ascertained that such is the case relief would no doubt be granted to it by proper application to the Public Service Commission for authority to increase its rates. The concern of the courts ordinarily is only as to the power of the legislature to impose the tax. The extent to which it may ·go is ordinarily a question for the legislature to determine, and so long as the tax imposed does not exceed the value of the privilege granted the courts will not ordinarily interfere to enjoin it upon the ground that it is unreasonable or confiscatory.

The gas company further insists that the act is invalid upon the ground of uncertainty, it not providing that the measurement of the gas shall be made at a particular pressure, and that inasmuch as it transports gas under varying pressures the amount would be increased or decreased as the pressure under which the same was transported was increased or decreased. The act confers upon the State Tax Commissioner authority to make such regulations as may be necessary for its proper administration, and it may be said that if this suggested question presents any difficulty in that regard, it could be, or would be covered by a regulation of the State Tax Commissioner. We think, however, it is a sufficient answer to the objection that this gas, so far as it is purchased, is purchased by measurement, and is sold measured by the thousand cubic feet, and we have never heard, nor are we informed in the record, that the complainant gas company has ever had any difficulty in collecting from its customers because of uncertainty in the amount of gas

delivered. If this basis of measurement can be applied by the company in a practical way in carrying on its business between it and its customers, it is a little difficult to understand why it is not certain enough as a measure for the collection of the tax imposed.

It follows from what we have said that the act properly construed is a valid exercise of the legislative power imposing a tax upon the privilege of carrying on the business of intrastate commerce in the transportation of oil and gas, based upon the amount of such commerce.

This would dispose of the case were it not for the fact that there is a great diversity of opinion between counsel for the respective parties as to the character of a large part of the commerce handled by the complainants, counsel for the complainants contending that practically all of their business is interstate, while counsel for the respondent earnestly contend that practically the whole thereof is intrastate commerce, and subject to the tax in any event. This makes it necessary for us to consider, upon the facts presented, the extent to which the injunction granted by the court below will have to be modified, and makes necessary that we determine what part of the business done by each of the complainants is interstate, and what part intrastate, so that the injunction may be perpetuated as to that part which is not subject to the tax, and dissolved as to the residue.

The oil transported by the complainant pipe line company is classified into four grades, known as Somerset-Cabell, Mid-Continent, Corning, and Pennsylvania. All of the oil produced in West Virginia and transported by this complainant is of the Pennsylvania grade, except a small amount produced in Cabell county, which is delivered to the complainant pipe line company, together with the Somerset oil produced in Kentucky, by the Cumberland Pipe Line Company at the Tug River terminus of the complainant's line. This oil is transported through the state from this terminus to the terminus of the company at the Pennsylvania state line, and it is insisted that the same constitutes interstate commerce. Counsel for the respondents contend, however, that it cannot be considered as interstate commerce, for the reason that when it is delivered

into the state of West Virginia its destination is not yet determined and fixed, and that the oil is not really consigned to a point beyond the state of West Virginia until after or about the time it reaches Morgantown in the pipe line, and sometimes not until it is stored in the tanks at Morgantown; and further that it cannot be considered as interstate commerce, for the reason that while it is in the state of West Virginia it becomes mixed with other oil within the state, which mixture has the effect to change its character from interstate to intrastate commerce, if indeed it can be said to have had a character as interstate commerce. The first proposition is based upon the facts shown that when this oil produced in Kentucky is delivered to the Cumberland Pipe Line Company that company, because of lack of facilities, delivers it, or at least a substantial part of it, to the complainant pipe line company in advance of any consignments therefor, and the complainant pipe line company takes it into its pipe lines and tanks and holds it until such consignments are made, it being claimed that it is thus held in storage in the state of West Virginia for and on behalf of the Cumberland Pipe Line Company, and a charge made therefor. We do not see how this can affect the matter one way or the other. The tax is not laid upon the business of storing oil within the state, but upon the business of transporting it, and assuming that this oil is received in storage by the Cumberland Pipe Line Company, and because of its lack of facilities turned over to the Eureka Pipe Line Company and held by it in storage, its transportation from the point of storage in Kentucky to the point of storage in West Virginia would be as much interstate commerce as if it had changed ownership in the meantime. The transportation is from the point of storage in the state of Kentucky to the point of storage in the state of West Virginia, wherever these respective points may be. The fact that the commodity transported may not have changed ownership during the movement, or that the movement was not for the purpose of effectuating a change of ownership, has nothing to do with fixing its character as interstate commerce. Then when the oil was finally consigned from the point of storage in West Virginia to its destination, which was at the seaboard, this movement was likewise interstate commerce. The com-

plainant argues that the storage was only incidental to the
transportation, and this may be true, but whether true or not
we do not consider it at all material, for certain it is that what-
ever movement was made of this oil it was made in interstate
commerce. If we treat it as a continuous movement from the
point at which it was received by the Cumberland Pipe Line
Company in Kentucky to its destination at the seaboard, it
was interstate commerce. If we treat it as a broken movement
from the state of Kentucky to a point in West Virginia, where
the Eureka Pipe Line Company stored it and kept it for awhile,
and then reshipped it to its destination, both of these move-
ments were in interstate commerce. The second ground upon
which it is urged that this Somerset oil became intrastate com-
merce is that it became mixed with other oil in the state, and
thus lost its character as interstate commerce. This argument
is based upon the showing that the oil is moved through the
pipe lines in columns, that is to say, when a sufficient quantity
of oil is found on hand to justify it, the grade of oil which is
then being transported in the pipe line is turned off and an-
other grade turned in until the supply of this grade on hand
is exhausted, when it is turned off, and another grade turned
into the line following it. At each end of the column of oil
thus formed it comes in contact with oil of another grade, and
in this way, to some extent, becomes contaminated or polluted,
and it is insisted that because of this its character as inter-
state commerce is in some way changed, and it becomes a part
of the body of the property of the state. It seems to us that
this argument is rather strained. This method of transport-
ing oil by pipe lines is one in general use, and it is shown that
it is not practicable, indeed not possible, to so transport it
without to some extent contaminating the columns of oil of
the different grades at the points of contact. This does not in
any way, however, change the character of commerce to which
it belongs. When the owner of the oil delivers it to the pipe
line company he knows from the usage of the business that this
will happen, and he agrees that he will accept the oil at the
point of destination contaminated to the extent that the ex-
igencies of the transportation may require. This contamination
or pollution is simply incident to the movement or transporta-

tion of the oil. It is a result that comes therefrom. The property is never received within the state for any other purpose but its transportation therethrough, and if as an incident of that transportation it should necessarily become contaminated with some other substance it cannot be said that its character would be changed. As an incident of transportation of cattle in interstate commerce, they must be fed at different points along the route, and it may be expected that their weight would be increased, or their substance changed from the food thus administered to them, but would it be contended for a moment that this would change their character as interstate commerce, and cause them to become a part of the body of the property of each state in which they were fed? The contamination of this oil by contact is just such an incident of transportation, and has no more effect upon the character of the oil as commerce than feeding the cattle has upon their character as to the class of commerce to which they belong. We are, therefore, of opinion that this Somerset oil transported through the state is not subject to the tax imposed by the act. There is likewise a considerable amount of what is known as Mid-Continent oil delivered to the Eureka Pipe Line Company by the Southwestern Pipe Line Company, transported for a short distance through the state, and again delivered to the Southern Pipe Line Company. This transportation of this oil by the Eureka company is simply a little link in its journey from the place of production in Texas, Oklahoma, and other mid-continent states, to its ultimate destination at the seaboard. Considerable quantities of Corning oil are likewise received by the Eureka Company from the Buckeye Pipe Line Company, and transported across the state, and delivered to the Southern Pipe Line Company at the Pennsylvania line. The same is true of considerable quantities of Pennsylvania oil produced in Ohio and delivered by the Buckeye Pipe Line Company to the Eureka Company, and by it delivered to the Southern Pipe Line Company for further transportation to its ultimate destination. The oil thus transported, it is contended by the respondents became intrastate commerce, and subject to the tax, upon the theory of contamination above referred to. What we have said above upon this question sufficiently answers the

contention, and indicates the conclusion that this is all inter-state commerce, and not subject to the tax.

Of the oil produced in West Virginia and transported by the Eureka Company, a considerable portion thereof is de-livered to the refineries located within the state. This, it is admitted, is intrastate commerce. There is still another larger portion, amounting to several million barrels a year, which ul-timately finds its way outside of the state. The respondents contend that this is intrastate commerce, while the complain-ants contend that it is interstate commerce. The contention of the respondents is based upon the showing that this oil is produced in various parts of the state of West Virginia, is de-livered to the numerous branch lines of the Eureka Company, and gathered together by it at central points, from which it is ultimately shipped to its destination, some of it within and some of it without the state. At the time the oil is delivered ino the pipe lines, the Eureka Company gives to the owner a credit certificate showing that it holds for him a certain num-ber of barrels of oil, and the oil is then transported through the small feeding lines into which it is delivered until it ulti-mately reaches the trunk lines. Of course, movement of oil through the trunk lines is continuous, and the agreement of the owner of the oil upon delivery is not that he shall receive back the same oil that he has delivered, but the same amount of oil of a similar grade. We think this agreement with the owner, as well as the statute of this state, which recognizes the right of pipe line companies to deliver a like amount of oil of the same 'grade in lieu of that received, is the equivalent in law of the delivery of the very oil received. The parties by their contract make it so, and the exigencies of the business, as well as the law of the land, justify the contract. A large part of these credit certificates are bought up by the larger dealers in oil, notably the South Penn Oil Company, and the Carter Oil Company, in which instance the oil is delivered by the Eureka Company through its pipe line at such point as the owner of the credit certificates may direct. For the service rendered by it in gathering the oil together, and conveying it to its trunk lines during the period involved in this case it charged and re-ceived twenty cents per barrel, known as a gathering charge,

and fixed by the Public Service Commission of West Virginia. This charge has since been increased to thirty cents a barrel. For the transportation of the oil through its main pipe lines, after so gathering it, to the point of destination, it charged a rate fixed by the Interstate Commerce Commission, depending upon the point of destination, and this rate was divided between it and the connecting carrier upon an approved basis. The pipe line company contends that this oil, so far as it ultimately went without the state of West Virginia was interstate commerce from the very minute that it was delivered to it while the respondents contend that it did not become interstate commerce until it was definitely determined that its destinaion was without the state. It cannot be denied that when the oil is delivered to the pipe line company it has no fixed destination. It is known that beyond all reasonable probability a large part of it ultimately will go outside of the state, and a considerable part of it be used within the state at local refineries, but as to what particular producer will sell his oil to the local refineries, and as to which particular producer will ship his oil without the state, is not determined until after the oil is gathered, and the gathering charge above referred to has accrued to the pipe line company. Under this state of facts, we think the process of gathering the oil, for which the charge of twenty cents was formerly made, and for which thirty cents is now charged, is engaging in the business of intrastate commerce. The situation here is very similar to that in *Arkadelphia Co.* v. *St. Louis S. W. Ry. Co.*, 249 U. S. 134. There it was insisted that rough lumber taken from the woods to milling points in the state, where it remained for several months in the process of manufacture, and was then shipped to points beyond the state was interstate commerce, while being shipped to the mills in its rough state, because it was known in advance that it would ultimately enter into such commerce. The contention was denied upon the ground that while experience and market conditions justified the belief that it would ultimately go into interstate commerce, it did not in fact become such commerce until its destination to a point without the state was identified. Another case very much in point, and throwing much light upon the question involved here, is that of *McCluskey* v. *Ry.*

87 W. Va.

*Co.*, 243 U. S. 36. We conclude that the business carried on by the defendant pipe line company in gathering the oil produced in West Virginia and transporting it to the central points for the purpose of shipment, is intrastate business, and subject to the tax referred to, and to the extent that the respondents are enjoined from levying a tax upon such business, the decree rendered by the lower court will be reversed.

Coming to a consideration of the business of the complainant gas company, we find that a large amount of the gas transported by it is sold and delivered to its customers within the state of West Virginia, which is admittedly intrastate commerce. We also find that a considerable part thereof is transported by it directly through its own lines to the states of Ohio and Kentucky, and there by it delivered to its customers, which is unquestionably interstate commerce, and not subject to the tax. The remainder of the gas transported by it is delivered, a considerable part thereof to the Columbia Gas & Electric Company at a point in Cabell county in this state; another considerable portion delivered to the Ohio Fuel Supply Company at Ravenswood, and the remainder delivered to the Hope Natural Gas Company and the Pittsburg and West Virginia Gas Company at a point in Braxton county. We will first consider that portion delivered to the Ohio Fuel Supply Company. It appears that the complainant entered into a contract several years ago with the Ohio Fuel Supply Company to deliver to it a certain quantity of gas per month, or per year, over a certain period of years, and that pursuant to that contract it has been delivering to that company at a point on the Ohio River· the quantity of gas called for, which is transported across the river, and all sold by the Ohio Fuel Supply Company to its patrons in the state of Ohio. The apparent difficulty in determining the class to which this commerce belongs results. we believe, from the fact that the transportation companies in each instance is also the owner of the subject of commerce. If we consider the subject of this commerce as owned by parties different from the transportation companies, the question is easy of solution. Suppose that A. B., the owner of the gas in West Virginia, sells to C. D., the consumer of the gas in the state of Ohio, the quantity of gas provided in this case, and

that this gas intended and destined for delivery to C. D. is delivered by A. B. to the United Fuel Gas Company as a transportation company for delivery to C. D. through the connecting carrier, the Ohio Fuel Supply Company. It will thus be seen that the United Fuel Gas Company and the Ohio Fuel Supply Company in their capacity as carriers form a single connecting link between the point of production of the gas to the point to which it is destined for consumption. They are in no different position than connecting carriers by rail. The fact that the delivery is made from the one to the other at the state line does not affect the character of the commerce. When it was delivered to the first carrier it was intended and was destined to a point in another state, and that fact gave to it its character as interstate commerce. Whatever may be said as to the duty or obligation of the United Fuel Gas Company as a public service corporation, or of the power of the Public Service Commission to require service from it to its patrons in West Virginia, it cannot be denied that to the extent that it delivers gas to the Ohio Fuel Supply Company for consumption in Ohio, and which is destined to Ohio points at the time it is received by it, it is engaged in interstate commerce, and in such case is not subject to the tax imposed by this act. The gas delivered by it to the other three companies above referred to is on quite a different basis. For the year under consideration, of the gas delivered to one of them, 33 per cent. was sold within the state, and 67 per cent. sold without; of that delivered to another, 12 per cent. was sold within the state, and 88 per cent. sold without; and of that delivered to the other, 99 per cent. was sold without the state, and only 1 per cent. within the state. If we can visualize this situation from the standpoint of the owner of the commodity being different from the company transporting it, we believe the question will be simplified. This gas was all purchased by the several companies and delivered under several contracts which extended over a period of years. At the time it was put in course of transportation it had no fixed destination other than the point of delivery to the purchasing company, that is to say, it was not known by the owner of the gas where it would ultimately go, as in the case of the gas delivered to the Ohio Fuel Supply

Company. It is true it appears that a large part of it was ultimately conveyed without the state, and it was known at the time it was purchased that a large part would be so sold without the state, but as to what part neither party to the contract at the time knew; and while the percentages given above apply to the gas delivered for the year under consideration, there is no assurance that the same percentages will apply to any succeeding year, except the probability that the business of these companies will likely be carried on in substantially the same manner. When the owner of the gas, considering the owner as separate from the transportation company, delivered it to the transportation company, no particular part of it, nor any particular percentage of the total, was destined to any point without the state, so that it cannot be said, under the decisions we have above cited in discussing a similar question in its application to the pipe line company, that any part of this gas was interstate commerce during the time it was being transported by the United Fuel Gas Company.

What we have said results in a reversal of the decrees of the circuit court to the extent that the defendants are enjoined from collecting the tax upon the intrastate business of the complainants as the same is above defined, and in all other respects said decrees will be affirmed.

*Reversed in part. Affirmed in part.*