STANDARD OIL CO. OF NEW JERSEY v.
FOX.
No. 3312.

District Court, S. D. West Virginia.
March 1, 1934.

H. D. Rummel, Donald O. Blagg, and A. G. Stone (of Rummel, Blagg & Stone), all of Charleston, W. Va., for plaintiff.

Homer A. Holt, Atty. Gen., R. Dennis Steed, Acting Asst. Atty. Gen., and Wm. Holt Wooddell, Asst. Atty. Gen., for defendant.

Before SOPER, Circuit Judge, and McCLINTIC and CHESNUT, District Judges.

SOPER, Circuit Judge.

This suit was brought to secure an injunction to restrain the state tax commissioner of the state of West Virginia from paying into the treasury of the state the sum of $240,173.50, paid to him under protest by the plaintiff corporation upon his demand that, under the provisions of an act of the state Legislature passed on March 8, 1933 (chapter 36), the money was due for license taxes upon certain gasoline filling stations and bulk distributing plants which it owned or controlled. The bill of complaint prays that a temporary restraining order and interlocutory injunction be issued; that upon final hearing the injunction be made perpetual; that the sum collected be declared a trust fund in the hands of the defendant for the use of the plaintiff; and that the defendant be required to account for and return it to the plaintiff. The grounds of the suit are: (1) That the application of the act to operators of automobile service stations violates the due process and equality clauses of the Fourteenth Amendment to the Federal Constitution; (2) that the act violates the uniformity requirement of the state Constitution; and (3) that, when properly construed, the act is not intended to apply to the places of business conducted by the plaintiff.

Sections 1 and 2 of the act provide that it shall be unlawful for any person to operate any store in the state without first having obtained a license from the state tax commissioner; and require every person desiring to operate more than one store to make a separate application to the state tax commissioner for each such store. Section 5 provides that each person operating "one or more stores or mercantile establishments within this state" shall pay, upon each store, the following annual license fees: Upon one store, $2; upon 2 to 5 stores, $5; upon 6 to 10 stores, $10; upon 11 to 15 stores, $20; upon 16 to 20 stores, $30; upon 21 to 30 stores, $35; upon 31 to 50 stores, $100; upon 51 to 75 stores, $200; and upon more than 75 stores, $250. The term "store" is defined to mean and include "any store or stores or any mercantile establishment or establishments which are owned, operated, maintained and/or controlled" (section 8) by the same person "in which goods, wares or merchandise of any kind, are sold, either at retail or wholesale." Section 9 provides that any person who shall violate any of the provisions of the act shall be guilty of a misdemeanor, and, upon conviction, fined not less than $25, nor more than $100; and that each day that such violation continues shall constitute a separate and distinct offence. Section 11 provides that no injunction shall issue from any court in the state enjoining the collection of any license tax provided by the act, but the party claiming that any license is not due shall pay the same under protest "with the right to collect the same from the state tax commissioner by an appropriate remedy as provided by law." These sections are set out in full in the margin.[1]

---

[1] Sections of the act of the state Legislature of West Virginia passed on March 8, 1933 (chapter 36): ·

"Section 1. It shall be unlawful for any person, firm, corporation, association or copartnership, either foreign or domestic, to operate, maintain, open or establish any store in this state without first having obtained a license so to do from the state tax commissioner, as hereinafter provided.

"Sec. 2. Any person, firm, corporation, association or copartnership desiring to operate, maintain, open or establish a store in this state, shall apply to the state tax commissioner for a license so to do. The application for a license shall be made on a form which shall be prescribed and furnished by the state tax commissioner, and shall set forth the name of the owner, manager, trustee, lessee, receiver or other person desiring such license, the name of such store, and such other facts as the state tax commissioner may require. If the applicant desires to operate, maintain, open or es-

It is alleged in the bill of complaint that the plaintiff is the Standard Oil Company of New Jersey, a corporation incorporated under the laws of the state of Delaware, and is chiefly engaged in the business of refining, transporting, and distributing, at wholesale and retail, in various states of the Union, including West Virginia, gasoline, kerosene, oils, grease, and divers other petroleum products. In 1933 it owned or controlled in West Virginia 949 service or filling stations, or places of business, either through ownership or lease of the premises, or through contractual relations with the owners or persons in control of the premises. This total consisted of 101 stations, owned or leased by the plaintiff and operated by it, called company owned stations; 388 stations, called leased outlets, leased to the plaintiff and operated by the lessor or some other person in control of the premises under commission contracts with the plaintiff; and 460 stations, called vending privilege outlets, at which the plaintiff acquired by lease the right to store and sell its products, and which were operated by the lessor or other person in control under commission contracts. The control of the plaintiff of all of these stations is so complete that the plaintiff does not deny that they are operated by it within the meaning of the act. In addition, it operated 54 bulk or distributing

tablish more than one such store, he shall make a separate application for a license to operate, maintain, open or establish each such store, but the respective stores for which the applicant desires to secure licenses may all be listed on one application blank. Each such application shall be accompanied by a filing fee of fifty cents, and by the license fee as prescribed in section five of this act.

"Sec. 5. Every person, firm, corporation, association or copartnership opening, establishing, operating, maintaining one or more stores or mercantile establishments within this state under the same general management, supervision or ownership, shall pay the license fees hereinafter prescribed for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments. The annual license fee prescribed herein shall be as follows: (1) Upon one store, the annual license fee shall be two dollars for each such store; (2) upon two stores, or more, but not to exceed five stores, the annual license fee shall be five dollars for each such additional store; (3) upon six stores or more, but not to exceed ten stores, the annual license fee shall be ten dollars for each such additional store; (4) upon each store in excess of ten, but not to exceed fifteen, the annual license fee shall be twenty dollars for each such additional store; (5) upon each store in excess of fifteen and not to exceed twenty stores, the annual license fee shall be thirty dollars for each such additional store; (6) upon each store in excess of twenty, but not to exceed thirty stores, the annual license fee shall be thirty-five dollars for each such additional store; (7) upon each store in excess of thirty, but not to exceed fifty stores, the annual license fee shall be one hundred dollars; (8) upon each store in excess of fifty, but not to exceed seventy-five stores, the annual li-

cense fee shall be two hundred dollars; (9) upon each store in excess of seventy-five, the annual license fee shall be two hundred fifty dollars for each additional store.

"Sec. 8. The term 'store' as used in this act shall be construed to mean and include any store or stores or any mercantile establishment or establishments which are owned, operated, maintained and/or controlled by the same person, firm, corporation, copartnership or association, either domestic or foreign, in which goods, wares or merchandise of any kind, are sold, either at retail or wholesale.

"Sec. 9. Any person, firm, corporation, copartnership or association who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not less than twenty-five dollars nor more than one hundred dollars, and each and every day that such violation shall continue shall constitute a separate and distinct offense.

"Sec. 10. Any and all expenses incurred by the state tax commissioner in the administration of this act shall be paid out of the funds accruing from the fees imposed by and collected under the provisions of this act. All money collected under the provisions of this act shall be paid into the state treasury, monthly, by the state tax commissioner, and shall be added to and shall constitute a part of the general fund for the elementary schools.

"Sec. 11. No injunction shall issue from any court in this state enjoining the collection of any license tax provided herein, but the party claiming that any license is not due, for any reason, shall pay the same under protest with the right to collect the same from the state tax commissioner by an appropriate remedy as provided by law."

plants, maintained principally as supply depots for the storage and distribution of petroleum products to the said service stations or dealers handling its products and to commercial and industrial customers throughout the state. A relatively small quantity of petroleum products is sold on the premises of the bulk stations.

The defendant is the tax commissioner of the state of West Virginia, and is a citizen and resident of that state, and has his office in the city of Charleston. He is charged with the duty of enforcing all the tax laws of the state, including the act which is the subject of this suit. On June 5, 1933, subsequent to the passage of the act, he issued and circulated throughout the state a written order, wherein he notified the operators of all stores and mercantile establishments that within seven days thereafter they must make application for licenses under the act on pain of the penalties therein imposed; and he ruled and declared that the act imposes license fees upon the plaintiff for the privilege of operating its gasoline filling stations and bulk distributing plants in the state, according to the schedule of fees prescribed by section 5 of the act, and advised the plaintiff that, unless it immediately filed applications for the licenses, and paid the fees, it would render itself subject to the penalties and fees provided in section 9 of the act. Pursuant to these rulings and directions, the plaintiff, on June 6, 1933, filed its application for licenses for 1,003 locations in the state, accompanying the application, however, with a letter stating that the act imposed no liability for license fees upon it; and that it paid the same, under protest and duress, for the sole purpose of avoiding the imposition of fines and penalties in the event that the validity and applicability of the act should be sustained. The amount paid was $240,173.50, composed of the fees scheduled in the act, and the sum of 50 cents for each application, as required by the law.

Since the relief prayed in the bill of complaint constituted an interference with the enforcement of a state statute upon the ground that it is invalid under the Federal Constitution, and since the application for interlocutory injunction was pressed on this ground, a court of three judges was properly organized to try the case under section 266 of the Judicial Code (28 USCA § 380). Stratton v. St. Louis S. W. Ry., 282 U. S. 10, 51 S. Ct. 8, 75 L. Ed. 135; Public Service Corporation v. Batesville Telephone Co., 284 U. S. 6, 52 S. Ct. 1, 76 L. Ed. 135; Sterling v. Constantin, 287 U. S. 378, 53 S. Ct. 190, 77 L. Ed. 375.

The defendant filed a motion to dismiss, and also an answer to the bill of complaint. The motion to dismiss is based on the ground that the federal questions raised are frivolous and unsubstantial; and that, in any event, there is no equitable jurisdiction because the complainant has a complete and adequate remedy at law.

When the case came on for hearing, it was contended in support of the motion to dismiss that the right of a state to impose a graduated license tax upon a chain of stores has been firmly established by the decisions of the Supreme Court in State Board of Tax Commissioners v. Jackson, 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464, and Liggett Company v. Lee, 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699, and that therefore, under the rule laid down in Ex parte Joseph Poresky, 290 U. S. 30, 54 S. Ct. 3, 78 L. Ed. 152, the contention that the present act is contrary to the Fourteenth Amendment to the Federal Constitution is so obviously unsound that it raises no substantial federal question. Whether such a question is present in such a way as to give jurisdiction to the court must be determined by the allegations of the bill; and, in view of the subsequent discussion herein of the constitutionality of the West Virginia act, we need only point out here that the plaintiff asserts in the bill of complaint that it does not enjoy the peculiar economic advantages upon which the separate classification of chain stores for taxation was upheld by the Supreme Court in the cases cited; that the tax imposed by the West Virginia act is so high that it substantially equals the net earnings of the plaintiff on all of its outlets in the state during the year 1932, and exceeds the net earnings of 95 per cent. of said outlets; and that, in the practical operation of the act, there is an arbitrary discrimination between the business of the plaintiff and other oil companies, on the one hand, and the business of other general commodity chain organizations, on the other, in that in the former the ratio of the tax to the gross revenue is very high, and in the latter the ratio is very low, with the result that gross inequality in the burden of taxation ensues.

The right of the plaintiff to invoke the equitable jurisdiction of the court depends

upon the absence of an adequate remedy at law. A suit to enjoin the collection of a state tax on the ground that it involves an arbitrary and unreasonable discrimination against the taxpayer in violation of the Fourteenth Amendment will not lie in a federal court when, under the laws of the state, provision is made for the payment of the tax under protest with the right to bring suit for its recovery against the collecting officer or authority, and when means are provided for the satisfaction of any judgment that may be obtained. Henrietta Mills v. Rutherford County, 281 U. S. 121, 50 S. Ct. 270, 74 L. Ed. 737; Matthews v. Rodgers, 284 U. S. 521, 52 S. Ct. 217, 76 L. Ed. 447; Stratton v. St. Louis S. W. Ry. Co., 284 U. S. 530, 52 S. Ct. 222, 76 L. Ed. 465. See, also, Id., 282 U. S. 10, 51 S. Ct. 8, 75 L. Ed. 135. Section 11 of the West Virginia statute provides that the collection of the license tax shall not be enjoined by any court of the state, "but the party claiming that any license is not due, for any reason, shall pay the same under protest with the right to collect the same from the state tax commissioner by an appropriate remedy as provided by law." Section 10 provides that all money collected under the provisions of the act shall be paid into the state treasury monthly by the state tax commissioner, and shall be added to and shall constitute a part of the general fund for the elementary schools.

The bill of complaint charges, and the answer admits, that, prior to the institution of the suit, the tax commissioner had declared his intention to pay the license moneys paid to him by the plaintiff into the state treasury on the 1st day of July, 1933, and that such action would take place unless the tax commissioner was enjoined and restrained from so doing.

The remedy at law provided by the statute is the right to collect the license moneys from the state tax commissioner by an appropriate remedy, as provided by law. How this right is to be exercised is not made definite; nor is it made clear how the taxpayer, if successful in a suit brought for the purpose, may recover back his money. The defendant says that appropriate remedies are provided by section 1, article 3, chapter 12, and sections 1 to 5 of article 2 of chapter 14 of the West Virginia Code. The first mentioned statute provides in substance that every person claiming to receive money from the treasurer of the state shall apply to the auditor for a warrant for the same; that the auditor shall examine the claim and the evidence supporting it, and shall issue his warrant on the treasurer for so much of the claim as he shall find to be justly due from the state, if payment thereof be authorized by law and there be an appropriation not exhausted or expired out of which it is properly payable. On presentation of the warrant to the treasurer, he must ascertain whether it has been drawn in pursuance of an appropriation made by law, and, if so, he is authorized to indorse his check upon the warrant directed to some depository and payable to the person who is to receive the money.

The second statute provides in substance that any person having a pecuniary claim against the state, which the auditor has disallowed in whole or in part, may apply by petition to the circuit court of the county in which the seat of government is, to have the claim audited and adjusted. Provision is made for answer by the auditor, the production of evidence by either party, and a hearing without unnecessary delay. The court is required to ascertain what sum, if any, is due to the petitioner, and to certify its decision to the auditor; and, if the claim, or any part thereof, is allowed, the auditor must report the same to the Legislature at its next session; but no such claim shall be paid until an appropriation shall be made therefor by the Legislature. It is also provided that all suits in which it may be necessary to make the Governor, the Attorney General, the treasurer, or the auditor a party defendant as representing the state shall be brought and prosecuted in the circuit court in which the seat of government is.

In considering whether these statutes provide an adequate remedy at law, we are, at the outset, met with inquiry as to their meaning and with the well-established rule that a remedy is not considered adequate unless the statute which authorizes it is free from doubt and ambiguity, or unless its meaning has been clearly established by the decisions of the state courts. Thus it has been held that, when the statute relied on is a recent one, and has not been construed and applied by the highest court of a state, or when the meaning of the statute is not free from ambiguity or doubt, it cannot be said that the complaining party suing or plaintiff has an adequate or complete remedy at law. On the contrary, the existence of the remedy is debatable and uncertain. Wallace v. Hines, 253 U. S. 66, 68, 40 S. Ct. 435, 64 L. Ed. 782; Atlantic Coast Line

R. Co. v. Doughton, 262 U. S. 413, 43 S. Ct. 620, 67 L. Ed. 1051; Union P. R. Co. v. Board of Com'rs of Weld County, 247 U. S. 282, 287, 38 S. Ct. 510, 62 L. Ed. 1110.

The meaning of the West Virginia statutes cited in connection with the kind of suit now before the court has not been made clear by the decisions of the West Virginia courts. It was held in Woodall v. Darst, 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367, 44 L. R. A. (N. S.) 83, Ann. Cas. 1914B, 1278, that a mandamus may be employed against the auditor to enforce payment of a claim for which an appropriation has been made, the constitutionality of which the auditor questions. It was also held in Robinson v. LaFollette, 46 W. Va. 565, 33 S. E. 288, that the proceeding provided by chapter 14, art. 2, §§ 1 to 5, is not a civil case, reviewable by the Supreme Court on writ of error, but is merely a statutory proceeding for the auditing of a claim against the state; and that, even after the claim is audited by the circuit court, it must pass through the Legislature before it can be paid, and even there the appropriation may be contested.

It will have been noticed that section 11 of the Chain Store Act does not give the taxpayer who makes payment under protest the right to collect the money from the treasurer of the state, but merely the right to collect the same from the state tax commissioner, and it cannot be said to be free from doubt that such a right is covered by the general terms of the statutes last mentioned which in terms give a person claiming to receive money from the treasury of the state the right to apply to the auditor for a warrant on the same; and there is no decision of the Supreme Court of West Virginia, which throws any light upon the question.

It may be supposed that section 11 of the Chain Store Act, by the use of the term, "appropriate remedy," contemplates a common-law action of assumpsit for money had and received; but, whether the remedy contemplated by the Legislature is to be found in the terms of the statute permitting suit against the state auditor, or under the practice of the common law, in neither case is it free from doubt that provision has been made in any statute for the satisfaction of such a judgment as the taxpayer might obtain. There is no provision in the Chain Store Act itself, or in any other taxing statute to which our attention has been called similar to the state statute under consideration in Henrietta Mills v. Rutherford County, supra, or in Atchison, T. & S. F. R. Co.

v. O'Connor, 223 U. S. 280, 32 S. Ct. 216, 56 L. Ed. 436, Ann. Cas. 1913C, 1050.

The West Virginia chain store statute specifically provides that the money collected thereunder shall be paid into the state treasury monthly, and shall be added to and constitute a part of the general fund for the elementary schools. The stipulation of the parties, however, shows that there is no such fund. The principal funds and revenues of the state consist of (1) state fund general revenue; (2) state fund special revenue; (3) general school fund; (4) state road fund. The moneys actually collected by the state tax commissioner from licensees under the Chain Store Act, other than those covered by the interlocutory injunction in this case and in three similar cases, were actually paid by the state tax commissioner into the state treasury, and were there deposited as a part of the state fund general revenue. It is therefore obvious that the proper disposition of the fund is not free from doubt in the minds of the state officials for, although the state possessed a general school fund, which was used to pay the salary of school officials and teachers, including payments sufficient to supplement the elementary teachers' fund, the license moneys from the Chain Store Act were not paid into this fund, but into the general revenues of the state.

If the doubt and uncertainty arising from this situation could be overcome, there would still remain the difficulty as to how license payments paid under protest to the state tax commissioner, and by him turned into the state treasury, might be recovered back if, in a suit by the taxpayer, the tax should be declared invalid or unconstitutional. It is clear from the provisions of section 1, article 3, chapter 12, and sections 1 to 5 of article 2, chapter 14, that a determination in favor of the claimant upon the state treasurer could not be honored unless payment was authorized by law, and unless there should be an unexhausted appropriation out of which it might be paid. Once paid into the treasury, moneys could be taken out only by legislative appropriation.

The defendant claims that such a legislative appropriation is found in section 30-C, chapter 1 of the Acts of the West Virginia Legislature, the First Extraordinary Session of 1933, passed on June 3, 1933, whereby the sum of $5,500,000 was appropriated to supplement the general school fund for the fiscal year beginning July 1, 1933, and

a like sum for the fiscal year beginning July 1, 1934. The stipulation shows that the balance in this fund on October 31, 1933, for the first year mentioned, was $440,831.31, and that none of the appropriation for the fiscal year beginning July 1, 1934, has been expended. There is nothing in the act appropriating these sums which indicates that the moneys may be used for any other purpose than that designated in the act, to wit, for the purpose of paying teachers' salaries for four months, and for equalization fund purposes; but the defendant points to two other bills passed by the Legislature at its First Extraordinary Session of 1933 as follows: Section 7 of chapter 1 provides "for refunding moneys erroneously paid into the treasury such sums are hereby appropriated as may be erroneously so paid, payable out of the same fund into which paid"; and section 111 of subsection L of chapter 1 provides for refunding overpayments made into the treasury on account of taxes, license fees, and commissions, to be paid out of the fund into which they were paid, and appropriates such amount as may be necessary for the purpose. There are no decisions of the West Virginia courts in which these statutes are construed, and it is an open question whether license taxes intentionally and understandingly paid to the state tax commissioner under protest are within the description of the statute as "moneys erroneously paid into the treasury," or may be said to constitute an overpayment into the treasury on account of taxes and licenses. The doubt is increased when it is borne in mind that section 10 of the Chain Store Act provides that money collected under it shall constitute a part of the general fund for the elementary schools in the state treasury, notwithstanding the fact that there is no such fund. This defect might be overlooked by the West Virginia courts, and the moneys might be ordered to be paid out of the fund in which they have actually been deposited. But it cannot be said that the matter is entirely free from doubt. There is the additional doubt whether the sum of approximately $400,000, representing the balance in the general school fund on October 31, 1933, would be sufficient to cover, not only the payments made by the plaintiff corporation, but also those made by other persons who have paid the tax under protest and may bring an action to recover it back. Four oil companies, to wit, Standard Oil Company, Gulf Refining Company, Ashland Refining Company, and Sinclair Refining Company,

have brought suit against the state tax commissioner to recover back the aggregate sum of $449,423 paid by them under protest.

No greater relief is available to the taxpayer if it be considered that it may have a right of action against the state tax commissioner in his individual capacity under section 11, and the right to satisfy any judgment against him out of his individual assets. It is stipulated that, although the defendant is not personally insolvent, he is not possessed individually of money or property to the value of $240,000, and, so far as may be reasonably anticipated, will not be possessed in his personal capacity of the amount sufficient to enable him to respond in damages to the money judgment or decree which will be entered in favor of the plaintiff, if it shall prevail in this or any other proceeding for the recovery of the money so paid. The official bond of the defendant is in the penalty of only $5,000, as provided by section 1, article 1, chapter 11 of the Code of West Virginia.

We think, therefore, that no adequate legal remedy has been afforded the plaintiff in this case, for it is established beyond controversy in the field of state taxation that the mere ability to obtain a fruitless judgment will not defeat the equitable jurisdiction. Osborn v. Bank of U. S., 9 Wheat. 738, 6 L. Ed. 204; Dodge v. Woolsey, Fed. Cas. No. 18,032; Id., 18 How. 331, 15 L. Ed. 401; Arkansas Bldg. & Loan Ass'n v. Madden, 175 U. S. 269, 274, 20 S. Ct. 119, 44 L. Ed. 159; Matthews v. Rodgers, 284 U. S. 521, 52 S. Ct. 217, 76 L. Ed. 447; Stratton v. St. Louis S. W. Ry. Co., 284 U. S. 530, 52 S. Ct. 222, 76 L. Ed. 465.

This court, therefore, is empowered to entertain the application for an interlocutory and final injunction; and, having taken jurisdiction, may proceed to decide all questions involved in the case, both state and federal, and to afford to the plaintiff, not only the relief by injunction, but also, if it finds that the tax was improperly collected, to decree that the defendant be required to account for and return the money to the plaintiff. Piedmont, etc., Ry. Co. v. Query (D. C.) 56 F.(2d) 172; Greene v. Louisville & I. R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; Atlantic Coast Line Ry. Co. v. Doughton, 262 U. S. 413, 43 S. Ct. 620, 67 L. Ed. 1051.

The plaintiff's objection that the act involves an arbitrary discrimination against the business of the oil companies' chains of

gasoline stations, and therefore offends the Fourteenth Amendment, rests upon the practical effect of the application of the tax. The facts adduced to show this situation have been stipulated by the parties, and the more important of them are set out in the following recital: The total number of stores, including gasoline stations in the state, for which licenses were issued under the act in 1933, was 15,210, and the total fees paid amounted to $569,693. Single stores in the number of 10,722 paid $26,723, while multiple stores, in the number of 4,488, paid $542,970. Of the total, 4,453 gasoline stations paid $486,168, or 85.3 per cent. and, of this number, 2,453 chain gasoline stations paid $481,168, or 84.46 per cent. of the total tax, while 2,000 single stations paid $5,000. Five oil companies, including the plaintiff, paid $476,171, or 83.5 per cent., and the plaintiff alone paid $240,173, or 42.16 per cent. of the total tax. These striking results were reached because the oil companies greatly exceed all other businesses in the number of units at which their products are sold, and the graded tax is sharply in-

have paid 10.7 per cent. of the total tax. General commodity chain stores do a much larger business per unit, and have a smaller number of units in the state, than the gasoline chains, but they enjoy all the advantages of chain store organizations, since their business is of national scope and is carried on in many stores throughout the United States. The disparity in the application of the tax is shown in the following table in which the situation of the Standard Oil Company is compared with that of six other national general commodity chains. The figures are given for the year 1932 as if the chain store tax had been applicable at that time. For instance, it there appears that the Great Atlantic & Pacific Tea Company, maintaining 198 stores in the state, had a total gross revenue of $12,455,017, and would have paid a total chain store tax of $38,521, or an average of $194.55 per store, while the Standard Oil Company, with 1,046 stations, did a business of $6,428,701, and would have paid a total tax of $251,573, or an average tax per station of $240.51.

| | No. of stores or stations | Average Chain Store Tax | Total Chain Store Tax | Average Gross Revenue per Store | Total Gross Revenue |
|---|---|---|---|---|---|
| Sears Roebuck & Company........ | 4 | $ 4.75 | $ 19.00 | $140,715.00 | $ 562,861.00 |
| Montgomery Ward Company..... | 7 | 6.50 | 45.50 | 151,154.00 | 1,058,083.60 |
| S. S. Kresge Company............. | 12 | 9.83 | 118.00 | 140,428.00 | 1,685,141.00 |
| F. W. Woolworth Company....... | 21 | 17.50 | 367.50 | 84,698.00 | 1,778,671.00 |
| Kroger Grocery & Baking Co..... | 94 | 132.64 | 12,469.00 | 58,503.00 | 5,499,343.00 |
| Great Atlantic & Pacific Tea Company .......................... | 198 | 194.55 | 38,521.00 | 62,400.00 | 12,455,017.00 |
| Standard Oil Company Company owned stations.......... | 98 | 240.51 | 23,569.98 | 26,822.00 | 2,628,615.00 |
| All Gasoline Stations.............. | 1046 | 240.51 | 251,573.46 | 6,145.98 | 6,428,701.00 (including tires, &c.) |

Note: The average revenue gross per station is calculated with the bulk plants excluded. If they are included, the average would be reduced.

creased from $5 a store if not more than 5 stores are maintained, to $250 per store if more than 75 are maintained.

In sharp contrast with the large proportion of the tax paid by the oil companies is the small relative volume of business which they do in comparison with other chain store businesses herein referred to as general commodity chains. In 1932, the last year for which complete figures are available, 2,453 gasoline chain stations did an aggregate business of $15,198,638, or 4.6 per cent. of the total business, and would have paid 84.46 per cent. of the total tax had the law then been in effect, while 1,889 general retail stores in chain organizations did an aggregate business of $75,454,257, or 22.9 per cent. of the total business, and would

It is especially notable that the volume of business of the oil companies does not increase in proportion to the number of stations maintained. Generally speaking, the company owned stations of the Standard Oil Company do a larger business than the leased and vending privilege outlets at which it distributes petroleum products through agents. In 1932 the company owned stations, 98 in number, did a business of $2,628,615, while 948 agency stations did a business of only $3,690,397. The average gross revenue of company stations was $26,822, and of the agency stations $3,892. In 1931 only 157 agency stations out of 815, and in 1932 only 131 out of 948, sold more than 40,000 gallons per annum. A table for the agency stations in 1932 follows:

Table No. 6    Gross Revenue and Net Earnings to Plaintiff from Sale of Petroleum Products at Leased Outlets and Vending Privilege Outlets (Agency Stations) Grouped and Ranked According to Gallons of Motor Fuel Sold Calendar Year 1932

| Group No. | Annual Gallonage Classification | No. Outlets in Group | Total Gross Revenue | Total Store Tax For Group | Total Net Earnings | Profit or Loss After Payment Store Tax | | Average Gross Revenue Per Outlet By Groups | Average Store Tax Per Outlet | Average Net Earnings Per Outlet By Groups | Profit or Loss Per Outlet After Deducting Store Tax | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Profit | Loss | | | | Profit | Loss |
| 1 | 0— 10,000 | 319 | $ 307,080.18 | $ 76,722.69 | $ 4,384.00 | $ | $ 72,338.69 | $ 962.63 | $240.51 | $ 13.74 | $ | $266.77 |
| 2 | 10— 20,000 | 247 | 687,075.07 | 59,405.97 | 12,672.63 | | 46,733.34 | 2,579.25 | 240.51 | 51.30 | | 189.21 |
| 3 | 20— 30,000 | 155 | 681,360.60 | 37,279.05 | 17,823.96 | | 19,450.09 | 4,395.22 | 240.51 | 115.02 | | 125.49 |
| 4 | 30— 40,000 | 96 | 586,096.07 | 23,088.96 | 15,016.10 | | 8,072.86 | 6,105.16 | 240.51 | 156.42 | | 84.09 |
| 5 | 40— 50,000 | 56 | 441,803.19 | 13,483.56 | 10,261.98 | | 3,206.58 | 7,907.19 | 240.51 | 183.24 | | 57.27 |
| 6 | 50— 60,000 | 22 | 211,534.59 | 5,291.22 | 3,007.07 | | 2,284.15 | 9,615.20 | 240.51 | 136.68 | | 103.83 |
| 7 | 60— 70,000 | 23 | 267,398.76 | 5,531.73 | 5,926.27 | 394.54 | | 11,626.03 | 240.51 | 257.56 | 17.05 | |
| 8 | 70—100,000 | 16 | 236,816.12 | 3,848.16 | 4,217.99 | 369.83 | | 14,801.00 | 240.51 | 263.62 | 23.11 | |
| 9 | over 100,000 | 14 | 321,232.44 | 3,367.14 | 11,770.60 | 8,403.46 | | 22,902.31 | 240.51 | 840.75 | 600.24 | |
| | Totals...948 | | $3,690,397.02 | $228,008.48 | $85,085.60 | $9,167.83 | $152,085.71 | | | | | |

Net loss.....$142,917.88

Average Gross Revenue Per Outlet, 948 Outlets combined, 1932.................$3,892.82

Average Net Earnings Per Outlet, 948 Outlets combined, 1932.................$ 89.75

| | For 948 Outlets | Per Outlet |
|---|---|---|
| Chain Store Tax based on computed average tax for 1109 units in 1932.............. | $228,008.48 | $240.51 |
| Net Earnings.............. | 85,085.60 | 89.75 |
| Payment of Chain Store Tax out of Capital | $142,917.88 | $150.76 |

The small volume of business done in most of the Standard Oil stations in the state is reflected in the small profits and the heavy burden of the tax when contrasted therewith. In 1931 the average profits of all the gas stations, excluding bulk plants, were $539.24 per station, while the tax, computed according to the rate of the act of 1933, would have been $239.29. In 1932 the profit was $248.37 per station, and the estimated tax $240.51, and in the first six months of 1933 the loss per station was $94.39, to which must be added the tax of $119.72. The average net earnings in 1930 for 105 company owned stations were $3,000 per station; in 1931, for 96 such stations, were $3,641 per station; in 1932, for 98 such stations, were $1,782 per station, and in the first eight months of 1933, for 94 such stations, were $109.72 per station, exclusive of the chain store tax. A much worse showing was made by the agency stations. In 1931 the average net earnings per outlet for 815 outlets were $173.85. In 1932 similar earnings for 948 outlets averaged $89.75, and in the first six months of 1933 there was a net operating loss per outlet for 856 outlets of $62.97. The taxes per store for the respective periods would have been $239.29, $240.51, and $119.72. The total chain store tax on these agency stations would have exceeded the profit in 1931 by $53,330; in 1932 by $142,917; and increased the loss in 1933 from $53,905 to $156,381. The experience of the four other leading oil companies doing business in the state, to wit, Gulf Refining Company, Pure Oil Company, Ashland Refining Company, and Sinclair Refining Company, was less profitable than that of the Standard Oil Company.

It is contended by the defendant Tax Commissioner that these figures, although shown by the books and records of the plaintiff company, and by the stipulation of the parties, do not portray the real profit of the company from the operation of its stations. It is suggested that larger profits might have been realized and credited to some other department of the business, or to some affiliation of the company. The Attorney General of the state requested that he be furnished with the names of all the Standard Oil group of companies, including parent companies, subsidiary companies, and affiliates; the character of business engaged in by them; the character of the affiliation; and the sep-

arate profits and losses of all of said companies for the years 1930, 1931, 1932, and the first eight months of 1933. In reply to these questions it was shown that the Standard Oil Company (incorporated in New Jersey), the parent corporation, is solely a holding company and owns all of the stock or an interest in a number of producing, manufacturing, transporting, and marketing companies engaged in the petroleum and natural gas business and collateral enterprises in the United States, Canada, England, France, Germany, Italy, Poland, Australia, Brazil, Argentina, Mexico, Norway, Sweden, Dutch East Indies, and other countries; and it was stipulated that the accountants of the company, if asked to furnish the information contained in the request of the Attorney General, would decline to make further answer than that contained in the calculations referred to, or to give any information concerning the profits and losses of the subsidiaries and affiliations, for the reason that such information would be immaterial to the matters involved in the case as it would concern matters outside of the marketing transactions of the plaintiff, the Standard Oil Company of New Jersey, a Delaware corporation. It is obvious that the request of the Attorney General was so broad that the plaintiff's accountants were justified in their refusal; and, since, as shown in the findings of fact, the billing price at which the petroleum products were delivered by the company's refinery to the company's stations approximated the current market price, the profit or loss obtained by comparing these figures with the established selling price to the customer was the actual profit or loss of the marketing transactions on which the store tax was imposed.

While these results may have been affected by bad economic conditions generally prevailing, they were not wholly or even largely affected thereby. The official reports of the state show that during the year ending June 30, 1931, and June 30, 1932, the gallonage taxes collected, based upon the volume of gasoline sold, exceeded similar figures in the prior years from 1927 to 1930, and the figures for the year ending June 30, 1933, exceeded those in the years ending in 1927, 1928, and 1929. It is possible that overproduction and competition of oil companies during the period may have caused them generally to conduct their business at a loss, but the record is silent on this point. In any event, general bad business conditions did not materially affect the volume of sales during 1931 and 1932. The figures at least warrant the final conclusion that the addition of large numbers of new stations, in excess say of 150 stations, has been accompanied by diminishing, rather than increasing, returns, that the volume of business of even the very best stations has been on the average less than one-half of the average business done by general commodity stores in their least active units, and that the volume of business on the average of all gas stations over 150 per chain has been so small that little or no profit would have remained after payment of such a tax as that imposed by the statute. The net profits of general commodity chain organizations subjected to the tax are not available, but the ratio of the tax borne by them to their gross revenue is in no way comparable with the similar ratio in the case of oil company stations, and it is a fair inference that a similar disparity exists as to the ratio of the tax to net earnings of each class of chain organizations.

With these facts in mind, we come to consider the contention that the West Virginia statute violates the equal protection clause of the Fourteenth Amendment. The principles which underlie classification for the purpose of taxation are familiar. They are summed up in Ohio Oil Company v. Conway, 281 U. S. 146, 159, 50 S. Ct. 310, 313, 74 L. Ed. 775, as follows:

"The States have a wide discretion in the imposition of taxes. When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the national government or violating the guarantees of the Federal Constitution, the States have the attribute of sovereign powers in devising their fiscal systems to insure revenue and foster their local interests. The States, in the exercise of their taxing power, as with respect to the exertion of other powers, are subject to the requirements of the due process and the equal protection clauses of the Fourteenth Amendment, but that Amendment imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to schemes of taxation. The State may tax real and personal property in a different manner. It may grant exemptions. The State is not limited to ad valorem taxation. It may impose different specific taxes upon different trades and professions and may vary the rates of excise upon various products. In levying such taxes, the State is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use, or value. To hold otherwise

would be to subject the essential taxing power of the State to an intolerable supervision, hostile to the basic principles of our government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to assure. * * *

"With all this freedom of action, there is a point beyond which the State cannot go without violating the equal protection clause. The State may classify broadly the subjects of taxation, but in doing so it must proceed upon a rational basis. The State is not at liberty to resort to a classification that is palpably arbitrary. The rule is generally stated to be that the classification 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'"

We are led to inquire from this statement of the rule what was the object of the West Virginia statute under consideration. The surrounding circumstances lead irresistibly to the conclusion that the purpose was to secure revenue for the support of the state government. The local situation is shown in the opinion of the Supreme Court of Appeals of West Virginia in Finlayson v. City of Shinnston, 168 S. E. 479, 480, announced on March 7, 1933. The people of the state at the general election of 1932 adopted an amendment to the West Virginia Constitution, art. 10, § 1 (see Acts W. Va. 1932, Ex. Sess., c. 9), which provides "that the aggregate of taxes assessed in any one year" upon the several classes of property therein enumerated shall not be in excess of certain specified amounts applicable to said classes respectively; except that the Legislature may provide, by general law, for limited increases of maximum rates upon the vote of the people. Subsequently, it was found that direct taxes upon property, when limited in amount as prescribed by the constitutional amendment, would not produce enough revenue to pay the interest on the bonded indebtedness of the state and create sinking funds for its retirement, and also to pay the running expenses of the government. In this situation the people of the city of Shinnston voted in favor of an additional bond issue for the improvement of their city water system, which would have necessitated an additional levy upon property over and above that permitted by the constitutional amendment; and the contention was made that the amendment pertains only to taxes levied for general or current expenses, and does not relate to levies imposed to meet the charges of a public debt. The Supreme Court of Appeals rejected this contention, and ruled that all levies for governmental subdivisions of the state should come within the maxima authorized by the amendment, except as might be otherwise required by paramount law. The provisions of the Federal Constitution, forbidding the passage of any law impairing the obligation of contracts, were not relevant, because the necessity for such legislation was not apparent.

Speaking of the financial condition of the state and local governments, Maxwell, President of the court, said:

"This court must take judicial notice of matters known of all men. 'Courts should take notice of whatever is or ought to be generally known, within the limits of their jurisdiction.' 15 Ruling Case Law, p. 1057. Therefore, we note that the burden of taxation in this state has reached the crushing point. It was upon that background that the Legislature in the summer of 1932 submitted to the people of the state a proposed constitutional amendment whereof one of the basic purposes was to place a limitation on direct tax levies, and it was on the same background that the people of the state at the November election adopted the amendment.

"Taxes levied by the various tax levying bodies of the state have very generally increased by leaps and bounds within the last decade. And not only that, but the people themselves of many taxation units have authorized bond issues, the interest and sinking funds of which now add substantially to the burdens of taxation. The serious economic depression of the last three years has greatly accentuated the tax situation. The people have come to realize that a public spending program of exaggerated proportions, such as came into being in the World War period and in the succeeding years of inflation bears heavily upon the people in a period of adversity.

"With these undesirable conditions existing, it must be considered that when the people of the state adopted a constitutional amendment providing that 'the aggregate of taxes assessed in any one year * * * shall not exceed' the maximum levies prescribed by the amendment for different classes of property therein enumerated, the people meant that such prescribed maximum levies should be in fact the outside limit, for all purposes, save only as such course might

imperil the integrity of solemn obligations and thereby violate paramount law. We say this because the plain language 'aggregate of taxes' means all the taxes. Simply that and nothing less. Such plain and unequivocal language leaves no room for interpretation. * * *

"The court takes judicial notice that the Legislature is now in session and that questions pertaining to the providing of additional sources of revenue through indirect taxation are receiving legislative attention. The court will not anticipate legislative failure in that particular."

In a concurring opinion, Hatcher, Judge, said: "We must assume that the Legislature gave due consideration to the reduced amount of revenues which would result from the restricted levies, and had in mind plans to supplement direct taxes with indirect taxation wherever necessary. The Legislature must have foreseen that, in order for some governmental agencies to function after the adoption of the amendment, revenue in addition to the restricted levies would be imperative. The submission of the amendment to the people was in effect an assurance of the Legislature that it would devise ways to replenish the shrunken treasuries which would follow the adoption. That assurance has been accepted, and we must presume that it will be fulfilled."

It was during the pendency of this case of state-wide importance that the Legislature considered and passed the Chain Store Act. It became a law without the approval of the Governor on March 8, 1933, the day after the decision just cited; and it was obviously intended, in view of the new constitutional restriction upon direct taxes upon property, to provide another source of revenue by taxing the advantages of chain store organizations in accordance with the method which had met the approval of the Supreme Court of the United States in the Chain Store Tax Cases.

The defendant, in its answer in the pending case, admits that the act is primarily a tax measure, but denies that it has nothing to do with the exercise of the police power of the state, averring that it is the policy of the state, in the interest of the general welfare, to encourage individual ownership and operation of business undertakings. However, we are left to the terms of the act itself and to the circumstances under which it was passed as the only sources of information on the subject. In a similar situation it was held by the Supreme Court of the

United States in Liggett Company v. Lee, 288 U. S. 517, 535, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699, that, in the absence of legislative declaration or record proof, the court, in considering the Florida Chain Store Act, could not attribute to the Legislature the purpose to suppress by taxation large corporate chains as a form of organization deemed inimical to the public interest. It had been suggested (288 U. S. 541, 585, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699), that the chief aim of the act was to protect the individual, independently owned, retail stores from the competition of chain stores by subjecting the latter to financial handicaps which might conceivably compel their withdrawal from the state; but the court, conceding, for the purpose of argument, that the Legislature might distinguish between corporate owners and individuals, and again between small owners and large owners, said that it was not permitted to guess at any such undisclosed purpose in the minds of the lawmaking body.

The same conclusion seems to be justified in this case, especially in view of the emergency with which the Legislature was confronted. In any event, there is no reason to suppose that a special animosity exists against the particular kind of chain business with which we have here to deal. The difficulty which the small store owner meets in competition with great national chains, and the hostility thereby engendered, doubtless gave rise to chain store taxation; but there is no evidence that the feeling is intensified, if indeed it exists at all, with regard to the numerous gasoline and oil stations which oil companies of national scope have established and maintained in every section of the country. Their establishment is a matter of comparatively recent date. It did not interfere with small businesses previously conducted by independent dealers; and the convenience of the large number of persons who travel by automobile is so greatly served by the wide distribution of service stations in various parts of the country that we cannot conclude that the public desires legislation which would result in their suppression.

The graduated classification under the West Virginia statute rests only on the number of stores in the chain, and we have to consider whether this classification is reasonable when it appears that the practical effect thereof is to exact heavy taxes from a particular industry out of all proportion to the value of the privilege enjoyed. Taxing

statutes, which measure the taxes imposed with reference to the number or amount of certain factual differences, are of course well known, and classifications based thereon have been sustained. Thus in Louisville Gas & Electric Co. v. Coleman, 277 U. S. 32, 48 S. Ct. 423, 72 L. Ed. 770, where the court considered a state tax based upon the recording of mortgages, it was said (page 38 of 277 U. S., 48 S. Ct. 423) that the state might take into consideration, as an element in fixing the amount of the tax, the time within which the indebtedness was to be paid, for the privilege of recording a short-time lien and that of recording a long-time lien have different taxable values; in Dow v. Beidelman, 125 U. S. 680, 690-1, 8 S. Ct. 1028, 31 L. Ed. 841, a state statute was sustained which classified railroad corporations by the length of their lines, and fixed a different limit of the rate of passenger fares in each class, so that the rate was 3 cents per mile on railroads more than 75 miles long, 5 cents for lines between 15 and 75 miles, and 8 cents for lines 15 miles or less; in Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283, 18 S. Ct. 594, 42 L. Ed. 1037, an inheritance tax law of Illinois was sustained which imposed a graduated tax on legacies, so that, for instance, one who received a legacy of $10,000 paid 3 per cent., and one receiving a legacy in excess of $10,000 paid 4 per cent.; in Clark v. Titusville, 184 U. S. 329, 22 S. Ct. 382, 46 L. Ed. 569, a license tax was sustained which provided that persons in different occupations should pay different amounts, and which classified persons in the same occupation by the maximum and minimum amount of sales; and in Metropolis Theater Co. v. Chicago, 228 U. S. 61, 33 S. Ct. 441, 57 L. Ed. 730, there was sustained a classification of theaters for license fee, graded according to prices of admission, since it was held that there was a natural relation between the price of admission and the revenue, and some advantage inhering therein. In these cases, however, there was some reasonable relation between the distinction based on numbers or amounts and the object of the legislation.

The Chain Store Tax Cases in the Supreme Court did not involve a decision of the particular question with which we are now concerned, for the classification sustained therein did not rest merely upon numbers of stores. It is true that in State Board of Tax Commissioners v. Jackson, 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464, the proof showed that the mere addition of a new unit or store to an existing chain does not increase the sales more than arithmetically, and the volume of business of other stores in the chain is not thereby increased, and it was demonstrated that the tax sustained bore more heavily upon chain stores than upon single department stores doing a large business. Pages 534, 535 of 283 U. S., 51 S. Ct. 540. In answering these considerations, the court said that, in determining how it shall classify occupations for taxation, the Legislature is not confined merely to the value of the business taxed, but may have regard to other elements. The court then outlined the advantages which chain stores alone enjoy, such as concentration upon one kind of stores in many neighborhoods, greater specialization in management and methods, as in massed buying for units selling similar goods, and intensive selling in a single line of business; and said (pages 541, 542 of 283 U. S., 51 S. Ct. 540) that the trial court had fallen into the error of assuming that the distinction between the business of a chain store corporation and that of other sorts of stores was solely one of ownership. Thus it was demonstrated that the classification did not rest merely upon the number of stores under one ownership, as was contended by the taxpayer and found as a fact in the dissenting opinion (page 543 of 283 U. S., 51 S. Ct. 540).

In the case of Liggett Co. v. Lee, 288 U. S. 517, 532, 53 S. Ct. 481, 484, 77 L. Ed. 929, 85 A. L. R. 699, the court, speaking of its earlier decision in State Board of Tax Commissioners v. Jackson, 283 U. S. 532, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464, said:

"The decision in the Jackson Case was based, not upon any single feature of chain store management, but upon the ultimate fact of common knowledge, illustrated and emphasized by the evidence, that the conduct of a chain of stores constitutes a form and method of merchandising quite apart from that adapted to the practice of the ordinary individually operated small store or department store. * * *

"As we have held, gradation of the tax according to the number of units operated cannot be said to be so unreasonable as to transcend the constitutional powers of the legislature. The addition of a store to an existing chain is a privilege, and an increase of the tax on all the stores for the privilege of expanding the chain cannot be condemned as arbitrary."

However, it was held that a statute,

which increased the license fee for all stores in a chain if any of them were located in different counties, was lacking in any reasonable basis of classification, since the adoption of a county line could have no reference either to density of population, congregation of the buying public, or any other factor bearing upon the choice of a business site. The court also said: "It is evident, however, that the mere spatial relation between the store and a county line cannot, in and of itself, affect the value of the privilege enjoyed. The appellees fail to show how the fact that the new place of business lies in another county increases the advantage over that to accrue from a location within the same county. The classification is solely of different chains, and the difference between them consists neither in number, size, surrounding population, nor in any factor having a conceivable relation to the privilege enjoyed."

We take this language to reiterate the holding that chain stores are taxable as such because they possess certain characteristics not enjoyed by other forms of merchandising, and that, in measuring the amount of the tax, it is not per se arbitrary or unreasonable to increase the tax on all the stores in a chain when a new store is added. Nevertheless it is also shown, in accordance with the general principle which forbids arbitrary or unreasonable classification for purposes of taxation, that a classification of different chains may be subject to condemnation if the difference between them has no relation to the privilege enjoyed.

Does it follow that a classification of chain store organizations is reasonable which has regard merely to the number of units in a chain, no matter how disproportionate the burden may be in its practical effect when the tax is applied to different members of the group? We think that this cannot be so, for, while it is settled that an occupational tax need not be measured merely by the value of the privilege enjoyed, it has never been said that, in determining whether a particular tax is unreasonable or arbitrary, all considerations of value may be excluded. On the contrary, it was unanimously held in Air-Way Electric Appliance Corporation v. Day, 266 U. S. 71, 83, 45 S. Ct. 12, 69 L. Ed. 169, that a state tax could not be sustained which fixed the annual fee payable by a foreign corporation for the privilege of exercising its franchises in the state with reference to the number of its shares of authorized common stock; the court saying that,

while such a charge need not be measured by the value of the privilege for which it was imposed, some relation to such value is a reasonable requirement. The Florida Chain Tax Law, considered by the court in Liggett Co. v. Lee, 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699, was condemned because the classification did not take into consideration any factor having a conceivable relation to the privilege enjoyed. See, also, Metropolis Theater Co. v. Chicago, 228 U. S. 61, 64, 33 S. Ct. 441, 57 L. Ed. 730; Ohio Oil Co. v. Conway, 281 U. S. 146, 159, 50 S. Ct. 310, 74 L. Ed. 775; Louisville Gas & Electric Co. v. Coleman, 277 U. S. 38, 48 S. Ct. 423, 72 L. Ed. 770, in all of which the materiality of value as an element entering into the reasonableness of a classification is noticed.

In applying these rules, we must take into consideration the factual situation, for the constitutionality of a taxing statute must be tested by its practical operation and the effect of its enforcement upon the taxpayer. Weaver v. Palmer Bros., 270 U. S. 402, 46 S. Ct. 320, 70 L. Ed. 654; Quaker City Cab Co. v. Pennsylvania, 277 U. S. 389, 401, 48 S. Ct. 553, 72 L. Ed. 927; Panhandle Oil Co. v. Mississippi, 277 U. S. 218, 48 S. Ct. 451, 72 L. Ed. 857, 56 A. L. R. 583; Air-Way Electric Appliance Corporation v. Day, 266 U. S. 71, 82, 45 S. Ct. 12, 69 L. Ed. 169. The effect of the West Virginia statute, as we have seen, is to place by far the greater part of the burden of the tax upon corporations maintaining chains of gasoline stations; general commodity chains do a very much larger volume of business, but pay a very much smaller tax than the gasoline chains; and the average tax, per unit, upon gasoline stations, is so large that it approximates the average net earnings thereof, whereas the volume of business of the general commodity chains is so much greater that the smaller tax applicable to them is not a matter of great significance. Two factors of much importance bearing upon the reasonableness of the tax are (1) that the general commodity chains enjoy all of the advantages of chain store organizations equally with chains of gasoline stations; and (2) that approximately 10 per cent. of the plaintiff's gasoline stations, which do the largest and most profitable business in populous centers, do very much less business than the stores in general commodity chains, while approximately 90 per cent. of the stations scattered throughout the state do so small a business that little or no profit is left after the tax is paid. In short,

since the amount of the tax is determined only by the number of stores, the addition of new stations, taxed at the highest rate fixed by the statute, tends not to increase, but to decrease, the profits of the whole business; and the consequence is that, as between members of the group composed of chain store organizations, the differences by which the gradations of the tax are fixed rest solely upon ownership.

In State Board of Tax Commissioners v. Jackson, supra, the comparison set up in the opinion of the court was between single stores and chains of stores, and, the differences of business methods being shown, it was held that the discrimination in the statute did not solely rest upon ownership. Here, the comparison is between members of chain organizations pursuing like methods of business common to the class. In Liggett Company v. Lee, supra, the highest rate of tax was $50 per store, and the effect of the operation thereof upon a large number of stores in a chain doing a relatively small amount of business per unit was not considered or compared with the effect of such a tax upon a chain doing a large volume of business in a small number of stores. There was no evidence on the point, and it was assumed that the mere addition of a store to a chain was a privilege of taxable value. In the present case, the highest rate of tax is $250 per store, and the total amount of the tax in every instance is fixed solely by the number of units without any reference to the amount of business done or profit gained. There results, as the evidence shows, the imposition upon one kind of chain organization of a heavy burden of taxation which has no reasonable relation to the advantages conferred; for other businesses, enjoying all of the benefits of chain organization, and receiving a much greater revenue, pay a much smaller tax. So it must be said, when the practical effect of the statute is considered, that the subdivision of chain organizations into groups does not bear a fair and substantial relation to the object of the Legislature, that all members of the class of chain organizations, similarly situated, are not taxed alike, and that the equal protection of the law guaranteed by the Fourteenth Amendment is denied.

It has also been urged upon us that the act is unconstitutional for the additional reason that it violates the due process clause of the Fourteenth Amendment. The facts and figures, which we have reviewed, tend very strongly to indicate that in effect the tax, as applied, absorbs substantially the entire profits of the efficiently conducted business of the plaintiff, although in terms the tax is a license measure for the privilege of doing the business; and it is pointed out that, unlike the gallonage tax, the chain store tax is of such a nature that it cannot be directly passed on to the consumer. So it is contended that the tax is in its essence confiscatory, and is therefore in violation of the due process clause of the Fourteenth Amendment. We feel that there is force in this argument, but, in view of the grounds herein elsewhere expressed with regard to the invalidity of the legislation when applied to the plaintiff's situation, we find it unnecessary to rest the decision upon this point.

The contentions that the act violates the uniformity provision of the Constitution of West Virginia, and that, when properly construed, the act does not apply to the plaintiff's places of business, are considered in the following opinion in which Judge CHESNUT speaks for the court:

## CHESNUT, District Judge.

At the threshold of the case lies a point of construction. Does the definition of a store in the act (Acts W. Va. 1933, c. 36, § 8) cover the gasoline "filling" or "service" stations conducted by the plaintiff and described in the stipulation? It is unnecessary to repeat the description in any detail as it is a familiar city or roadside spectacle well known to all at this time. Under a substantially similar statute it has very recently been decided in Indiana (Midwestern Petroleum Corp. v. State Board, 187 N. E. 882 (Ind. Supreme Ct. Dec. 15, 1933) in the affirmative; while in a very fully considered opinion (adhered to on re-hearing) it has been decided in the negative in Wisconsin (Wadhams Oil Co. v. Wisconsin, 210 Wis. 448, 245 N. W. 646, 649, 246 N. W. 687). In the former case the decision is based almost entirely on the ground that the word "store" in its dictionary sense is literally broad enough to cover the typical gasoline or service station because it comprehends a place where gasoline and similar automobile necessities, articles of merchandise, are sold at retail. In the latter case there was applied the well known principle of statutory construction that "as a general rule the words of a statute are to be taken in their ordinary and popular sense, unless it appears from the context or otherwise that they were used in a different sense." 2 Lewis' Sutherland, Statutory Construction (2d Ed.) § 390;

Old Colony R. R. v. Commissioner, 284 U. S. 552, 560, 52 S. Ct. 211, 76 L. Ed. 484. It was correctly said by the Wisconsin court that "in common language a filling station is not referred to as a store, or a mercantile establishment where goods, wares, or merchandise are sold or offered for sale at retail." A comparison of the reasoning in the two opinions leads us to the conclusion that the sounder rule as applied to this case is that adopted by the Wisconsin court. The dictionary definition of "store" is clearly too broad to be here controlling. It was well said by the Wisconsin court (210 Wis. 448, 245 N. W. 646, 246 N. W. 687, 688):

"There are many places where goods, wares, and merchandise of some kind are kept for sale which would not be understood, according to the common and approved usage of the language, to be stores or mercantile establishments. Among these might be enumerated tailor shops, shoe-shining parlors, wood yards, lumber yards, coal yards, brick yards, stone quarries, news stands, fruit stands, flower stands, cheese factories, restaurants, hotels, and no doubt others. * * * The same argument which supports the conclusion reached in the brief that a gasoline filling station is a store would support the conclusion that a brick yard is a store. It is a place where goods, wares, and merchandise are kept for sale at retail. No one could reasonably argue that the Legislature used the term 'store or mercantile establishment' in any such wide, comprehensive and unrestricted sense. No one has yet pointed out that according to the common and approved usage of the language the term 'store' or 'mercantile establishment' has ever been applied to a gasoline filling station."

There are other, and, in our view, even more persuasive considerations which lead to the same conclusion. We are here construing a statute which is familiarly known as a "chain store act," a type of legislation which now exists in some nineteen states and in recent years has been considered in numerous judicial decisions. The essential principle of these acts is to impose taxation in the form of license fees for the privilege of conducting stores, on a graduated scale, dependent upon the number of units or stores operated or controlled under one management. The type of business enterprise affected by such statutes is well identified in the public mind, but it is reasonably clear that the characteristics which serve to classify "chain stores" as such, as distinct from ordinary stores, do not apply to various other business enterprises involving control of multiple units. Thus a chain of hotels in one or more states has a similar feature of unified ownership or management but has never been thought to be within the provision of these chain store acts although literally also they are places at which goods, wares and merchandise are sold. Similarly it may be said that filling stations meet the needs of the touring automobile in the same general way that hotels and restaurants provide necessities for the traveller. The roadside filling or service station is the modern substitute for the livery stable in connection with an inn or tavern in days of travel by stagecoach. The dominant characteristic of the business is the "filling" of automobiles with gasoline, oil and water, and the rendering of "service" to the motorist—hence the name which aptly describes the business. Such transactions are in public thought quite distinct from the purchase of goods at an ordinary store.

Probably the greatest objection to chain stores is their tendency to eliminate the individual storekeeper, an occupation of long standing; but this cannot be said to be true of the chain of filling stations which is itself a feature of a new industry, filling a new public need, and being itself as much a pioneer in the new development of the automobile and petroleum industry as is the single independent station.

The filling or service station is thoroughly identified in the popular mind as a thing which is sui generis and the gasoline industry, including particularly the sale of gasoline at retail, has been the subject of separate legislation, it is safe to say, in every state of the Union. Legislation affecting chain stores and legislation affecting service stations are separate and distinct subject-matters each of which respectively has had its own course and, so far as we are advised, they have followed parallel lines which do not intersect in common thought and understanding. There has been no body of public thought or literature coming to our attention which has identified the chain of filling stations with the characteristic features commonly associated with the popular conception of chain stores. And the somewhat elaborate stipulation of facts in the case very clearly leads to the conclusion that the combined characteristics which feature the typical chain store system and which have served as a basis for special classification for pur-

poses of taxation do not inhere in multiple ownership or control of filling stations as compared with individual or independent ownership and operation of a single filling station. Therefore in searching for the meaning of the legislative definition of the word "store" as used in this "Chain Store Act," it is not reasonable, in our opinion, to determine that the typical filling or service station is a store as the term was defined in this "Chain Store Act," in the absence of language which plainly indicates from its context that such stations were intended to be included.

Taxing statutes, especially when they include highly penal provisions (as does this one) are to be construed in favor of and not against the taxpayer. Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211; Old Colony R. R. v. Commissioner, 284 U. S. 552, 561, 52 S. Ct. 211, 76 L. Ed. 484; Alyea-Nichols Co. v. United States (D. C.) 12 F. (2d) 998.

The state of West Virginia, in common with other states of the Union, has legislated particularly and expressly with regard to the licensing and taxation of filling stations as well as the gasoline sold therefrom. Article 14, c. 11, of the Code of West Virginia provides in substance that distributors of gasoline shall pay an annual license tax of $5.00 for "each distributing station or place of business" from which gasoline is sold for re-sale or distribution, and an annual license tax of $1.00 "for each filling station or place of business" from which gasoline is sold at retail. Code, 11-14-2. It is to be noted that here where the Legislature was plainly dealing with the particular subject matter of filling stations it appropriately used precise words which can leave no doubt as to the meaning, and in view of this precise particularity it is not reasonable to construe the general language of the "Chain Store Act," relating to a subject matter of different popular conception, to be inclusive of the particular subject matter so precisely described in other legislation. In accordance with the general presumption against double taxation, it has been held as a matter of statutory construction, in a number of cases, that where the particular business or occupation has been specifically dealt with in legislation by way of license fees or taxation, more general statutes which literally might be inclusive are not applicable. Gulf Refining Co. v. Chattanooga, 136 Tenn. 505, 190 S. W. 463; Piedmont Oil Co. v. Kennedy, 165 Tenn.

375, 54 S.W.(2d) 958; City of Newport v. Fitzer, 131 Ky. 544, 115 S. W. 742, 21 L. R. A. (N. S.) 279; Atlantic City v. Hemsley, 76 N. J. Law, 354, 70 A. 322; Bell v. Watson, 3 Lea (Tenn.) 328; Walker v. New Orleans, 31 La. Ann. 828.

In West Virginia the gallonage tax on gasoline is 4 cents. While in practical effect this tax is passed on to the consumer it nevertheless is a tax primarily on the vendor and furnishes a very material part of the whole of the state revenues, as is true in many other states. A similar situation existed in Wisconsin and was well expressed in Wadhams Oil Co. v. Wisconsin, 210 Wis. 448, 460, 245 N. W. 646, 246 N. W. 687, 688, as follows:

"Considering this (Chain Store Statute) generally in connection with other statutes relating to taxes, the Legislature may well have thought that, having already imposed a sales tax of 5 cents a gallon upon the use of gasoline by the operators of motor vehicles, approximately 33⅓% ad valorem, the business was already bearing its fair share of the tax burden."

The essential difference between filling stations and stores generally is not only well marked in popular understanding but has been judicially expressed in recent cases by the courts. It is said that in at least ten of these Chain Store Acts filling stations have been expressly excluded, and in some cases the contention has been submitted that the exclusion of filling stations from the incidence of general chain store legislation vitiates the act in its constitutional requirement of equality of operation. But this contention has been rejected. In Southern Grocery Stores v. South Carolina Tax Commission (D. C.) 55 F.(2d) 931, 933, Circuit Judge Parker said in dealing with the South Carolina chain store tax:

"There can be no question, we think, but that the exemption of gasoline filling stations from the tax rests upon a reasonable classification. Such stations as a general rule sell only gasoline and other articles of merchandise upon which the state collects a heavy excise tax, and it was doubtless for this reason that they were exempted from the tax in question. Furthermore, such filling stations are quite distinct from ordinary stores or mercantile establishments. Of course, if the operator of a filling station should operate a store or mercantile establishment in connection therewith, such stores would unquestionably be subject to the tax prescribed by the statute."

And dealing with a similar situation under the Florida act the Supreme Court in Liggett Co. v. Lee, 288 U. S. 517, 538, 53 S. Ct. 481, 486, 77 L. Ed. 929, 85 A. L. R. 699, said:

"But in view of the imposition of taxes on the operation of filling stations by other acts, pursuant to the Legislature's power of classification, we cannot declare their exemption from the tax laid by the Chain Store Act offensive to the guaranties of the Fourteenth Amendment."

The stipulation of facts discloses that the total possible annual revenue to the state from all chain stores subject to the act, if filling stations are included, is $569,693.06, and of this aggregate 85.3% will be payable by the operators of filling stations. In these circumstances it seems quite improbable that the Legislature could have intended to make the general word "stores" applicable to the very particular and distinct kind of stores, if they be stores at all, known as filling stations or service stations, without more particularity of description.

Another persuasive consideration for the construction which excludes a filling station from the scope of the act is that a grave question of the constitutionality of the act (both federal and state) is thereby avoided. The application of the act to the plaintiff becomes exceedingly onerous. There is force in the plaintiff's contention that it practically confiscates the value of the plaintiff's property by absorbing under the form of a license tax for privilege to do the business, the whole net profits of the business, and this not by virtue of faulty or inefficient management but from the very nature of the business itself. Filling stations to be of service to the public should be accessible to the motorist. This requires a large number of individual units in different locations throughout the state. If left to purely individual management there is likely to be a lack of co-ordination in location in the interests of the travelling public. Similarity of service both as to the kind of automobile supplies and accessories and trained attendants resulting from unified management is desirable for the public convenience. The economic result from the standpoint of the filling station, therefore, means a large number of small stations conveniently located. The possible volume of business for most of these stations is necessarily limited in amount. It is therefore natural to find, as is shown by the stipulation of facts, that the average net profit per station does not exceed a few hundred dollars a year and yet this tax as applied to the Standard Oil Company, the plaintiff in this case, requires the payment of a license tax of about $240 per station, thus exceeding the annual net profits of the whole business. The result will be obvious—either the abandonment of the stations, thus resulting in a detriment to the public and incidentally a cessation of the revenue, or some entire re-organization of the business which may be less convenient to the public.

The objections to the validity of the act, under the Fourteenth Amendment to the Federal Constitution, if applied to filling stations, are fully stated in Judge SOPER'S opinion for the court. In addition thereto and separately therefrom the plaintiff's counsel also contends that the act, if applied to filling stations, violates the Constitution of the state of West Virginia as amended November 8, 1932, the relevant portion of which reads as follows:

"Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the state, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. * * * The legislature shall have authority to tax privileges, franchises, and incomes of persons and corporations and to classify and graduate the tax on all incomes according to the amount thereof," etc.

It is said that the necessary construction of the above provision is to limit the power of the Legislature "to classify and graduate the tax" to incomes and to exclude the power with reference to privileges and franchises on the familiar principle of statutory construction expressio unius est exclusio alterius. (Note 1.)

Note 1: Comparison is invited between the above quoted provision of the West Virginia Constitution and similar subject matter as expressed in Constitution of South Dakota, as amended in November, 1918 (article 11, § 2), reading as follows:

"The legislature is empowered to impose taxes upon incomes and occupations, and taxes upon incomes may be graduated and progressive and reasonable exemptions may be provided;"

and also similar subject matter in section 1 of article 8, of the Wisconsin Constitution reading:

"Taxes may also be imposed on incomes, privileges and occupations, which taxes may be graduated and progressive, and reasonable exemptions may be provided."

Prior to November 8, 1932, the West Virginia Constitution in section 1 of article 10, empowered the Legislature "to tax, by uniform and equal laws, all privileges and franchises of persons and corporations." It is clear from the West Virginia decisions that under the latter constitutional provision occupations could be classified for purposes of taxation. In Sperry & Hutchinson Co. v. Melton, 69 W. Va. 124, 125, 127, 71 S. E. 19, 20, 34 L. R. A. (N. S.) 433, a license tax of $500 for engaging in the business of trading stamps was upheld, the court saying: "Of course there must be reasonable classification, and no unjust discrimination. The tax must be equal and uniform in relation to all persons of the same class." See, also, Sperry & Hutchinson Co. v. Blue (C. C. A. 4) 202 F. 82. And in Hope Natural Gas Co. v. Hall, 102 W. Va. 272, 278, 135 S. E. 582, a tax of a fixed percentage of gross receipts was upheld. And in Eureka Pipe Line Co. v. Hallanan, 87 W. Va. 396, 400, 411, 105 S. E. 506, a tax of two cents per barrel for crude oil transported by pipe line in the state with an exemption if the transportation by the entire system of the particular pipe line company was less in distance than ten miles, was upheld as sufficiently equal and uniform. It seems clear from these cases that the Legislature of West Virginia was not prevented under the earlier constitutional provision from classifying privileges and occupations, nor was it prevented from imposing a graduated tax in simple proportion to value or volume of business. It is contended for the plaintiff that the effect of the constitutional amendment is to now prohibit even simply graduated taxes on privileges and occupations, and an extended argument is submitted in support thereof; but if this is not so, then great reliance is placed upon the distinction between a simply graduated tax which varies directly in proportion to the amount of gross receipts of a business, and a progressively graduated tax which is stepped up in rate as the volume of business or number of units subject to the tax increases. And it is earnestly contended by plaintiff's counsel that the latter form of tax violates the state constitutional requirement as to uniformity, even though it does not run counter to the federal constitutional provision as to equality (State Board of Tax Com'rs v. Jackson, 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464) (note 2) and reference is made to many state court decisions which have adjudicated the invalidity of progressively graduated income and inheritance taxes under particular state constitutional requirements as to uniformity. (Note 3.)

Note 2: The Jackson Case did not involve consideration of a state constitutional requirement as to uniformity of taxation because the Indiana court had held its constitutional provision as to uniformity not applicable to occupation or license taxes. 283 U. S. 542, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464. And a similar situation existed in Liggett Co. v. Lee, 288 U. S. 517, 53 S. Ct. 481, 77 L. Ed. 929, 85 A. L. R. 699. While state taxes on occupations and privileges, on the simply graduated basis, are not unusual, and have been held generally free from constitutional objection in West Virginia (under the earlier constitutional provision) as well as elsewhere (37 C. J. 197, s. 51) instances of progressively graduated taxes applicable to occupations are comparatively rare, with the exception of the chain store taxing acts now existing in many states.

In the following cases the uniformity clause of state constitutions was held inapplicable to chain store license tax acts: Liggett v. Amos, 104 Fla. 609, 141 So. 153, 157; Penny Stores, Inc., v. Mitchell (D. C. Miss.) 59 F.(2d) 789, 792; State Board of Tax Comm. v. Jackson, 283 U. S. 527, 542, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464; Commonwealth v. Bibee Grocery Co., 153 Va. 935, 151 S. E. 293. In North Carolina and Kentucky the uniformity provision was held applicable, North Carolina sustaining a simply graduated tax (Great Atl. & Pac. Tea Co. v. Maxwell, 199 N. C. 433, 154 S. E. 838), and Kentucky sustaining a progressively graduated tax (Moore v. State Board of Charities and Corrections, 239 Ky. 729, 40 S.W.(2d) 349). A simply graduated tax has, however, been invalidated under the same constitutional provision where the owners of five stores are exempted, and the owners of more than five are taxed for the first five as well as the excess. F. W. Woolworth Co. v. Harrison, 172 Ga. 179, 156 S. E. 904; Great Atl. & Pac. Tea Co. v. Doughton, 196 N. C. 145, 144 S. E. 701. There seems to be no West Virginia decision dealing with a progressively graduated tax on occupation; so far as we are advised, the present Act now under consideration is the first legislation of that kind in the state.

Note 3: See the following cases holding such Acts unconstitutional: In re Opinion of Justices, 82 N. H. 561, 138 A. 284 (income tax); Williams v. State, 81 N. H. 341, 351, 125 A. 661 (inheritance tax); Cope's Estate, 191 Pa. 1, 43 A. 79, 45 L.

However, the analogy between income and occupation taxes is not necessarily absolute. In general it may be said that the tendency of the judicial decisions, in dealing with license taxes is to make no clear cut distinction between the uniformity and equality provisions of the state constitutions, and therefore a tax valid in respect to equality is not invalid as lacking in uniformity, and conversely, an unequal tax, because based on an unreasonable classification is also lacking in uniformity. Thus, while there may be no essential difference in legal principle between simple and progressively graduated taxes with respect to uniformity or equality, yet if the progressive rates of the tax bear no reasonable relation to the subject matter, or become so oppressive in practical application as to be confiscatory, the tax will also be invalid as lacking in uniformity. See Eureka Pipe Line Co. v. Hallanan, 87 W. Va. 396, 411, 413, 105 S. E. 506. In the last analysis, therefore, the question presented under the state Constitution as to uniformity is not substantially different from that under the Fourteenth Amendment to the Federal Constitution, as to equality and due process; unless as the plaintiff contends the amended Constitution of West Virginia prohibits any graduation of all taxes on privileges and occupation. And on this particular question we deem it unnecessary to express a definite opinion in the absence of any decision by the West Virginia court on its amended constitutional provision, especially as our disposition of the case on other grounds does not imperatively demand such a decision. Southern Grocery Stores v. South Carolina Tax Commission (D. C. S. C.) 55 F.(2d) 931, 933.

In opposition to the construction of the act, that it does not apply to filling stations, the defendant stresses the apparent intention of the Legislature evidenced by the defeat in one of the two Houses of the West Virginia Legislature, of an amendment expressly excluding filling stations from the Act. The implication from this action is by no means of clear import. State v. Lancashire Fire Ins. Co., 66 Ark. 466, 51 S. W. 633, 45 L. R. A. 348; Dist. of Columbia v. Washington Market Co., 3 MacArthur (10 D. C.) 559 (affirmed 108 U. S. 243, 2 S. Ct.

543, 27 L. Ed. 714); Murdock v. Memphis, 20 Wall. 590, 618, 22 L. Ed. 429. Apart from this we regard the question of construction of the language as written sufficiently clear and certain to render unnecessary resort to the legislative history of this act. State v. Harden, 62 W. Va. 313, 330, 349, 58 S. E. 715, 60 S. E. 394; U. S. v. Shreveport Grain & Elevator Co., 287 U. S. 77, 83, 53 S. Ct. 42, 77 L. Ed. 175; R. R. Comm. of Wis. v. Chicago, B. & Q. R. Co., 257 U. S. 563, 589, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Kelleher v. French (D. C.) 22 F.(2d) 341, 346.

It is also contended by the defendant that some of the service stations sell automobile tires and other accessories. But the stipulation of facts shows that the total amount of sales of such articles is comparatively small, being approximately 6.3% of the total receipts. It is apparent also from the facts that sales of these articles are incidental only and are substantially for service to automobiles en route rather than the vending of merchandise in the usual way. This small incidental sale of articles of merchandise is not sufficient in our opinion to convert a service station, otherwise not subject to the act, into a store within the act any more than the incidental sale of cigars and newspapers and flowers in the lobby of a hotel makes the latter a store as distinct from a hotel or restaurant. It is the dominant nature of the business which characterizes it for purposes of taxation. See Fisk Rubber Co. v. Hinson Auto Co., 168 Ark. 418, 270 S. W. 605; Cesar v. Virgin, 207 Ala. 148, 92 So. 406, 24 A. L. R. 715; Swanson v. DeVine, 49 Utah, 1, 160 P. 872. Of course, as was pointed out in the Wadhams Oil Company Case, it may become a question of fact with regard to any particular station whether by reason of the extent of its sale of accessories or otherwise, its dominant characteristic has become that of a store rather than a mere service station.

We conclude that the tax of $240,173.50, imposed upon the plaintiff corporation and paid by it under protest, was improperly collected, and that it is entitled to a decree whereby the defendant will be perpetually enjoined and restrained from paying said

R. A. 316, 71 Am. St. Rep. 749 (inheritance tax); State ex rel. Garth v. Switzler, 143 Mo. 287, 45 S. W. 245, 40 L. R. A. 280, 65 Am. St. Rep. 653 (succession tax); Bachrach v. Nelson, 349 Ill. 579, 182 N. E. 909 (income tax); and see Re

Harkness' Estate, 83 Okl. 107, 204 P. 911, 42 A. L. R. 399 (inheritance tax). Contra, Standard Lumber Co. v. Pierce, 112 Or. 314, 228 P. 812; Featherstone v. Norman, 170 Ga. 370, 153 S. E. 58, 70 A. L. R. 449.

money into the state treasury of West Virginia, and will be ordered and directed to account for and pay over said sum to the plaintiff.